[Crim. No. 13713. Fourth Dist., Div. One. Jan. 24, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS J. CELLA, JR., Defendant and Appellant.

**COUNSEL**

Monroe & Riddet and Keith C. Monroe for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Michael D. Wellington and Lillian Lim Quon, Deputy Attorneys General, for Plaintiff and Respondent.

Cecil Hicks, District Attorney (Orange), Michael R. Capizzi, Assistant District Attorney, and William W. Bedsworth, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

## Opinion

**STANIFORTH, J.**—Defendant Louis J. Cella, Jr., was indicted January 12, 1976, on 127 felony charges.[1] Over the past seven years he has made extensive pretrial suppression motions (Pen. Code, § 1538.5) and twice pleaded guilty to 10 of the 127 counts (7 counts grand theft, 3 counts presentation of false claims). He has served the term of imprisonment ordered and paid the fine imposed. He now appeals (for the third time) the judgment of conviction, again contending error in denial of his motion to suppress evidence.

The sole issue presented on this appeal is whether substantial evidence supports the trial court's conclusion that critical evidence of Cella's guilt was not tainted by the Don Ray (Aug. 4, 1975) print shop search held unlawful by this court in an earlier appeal. (*People* v. *Cella* (Mar. 28, 1979) 4 Crim. 8913.)

### The Offenses

The evidence of Cella's guilt is overwhelming and factually uncontested: Cella was a partner and a de facto controlling force (secretary-treasurer) in the Mission Community Hospital, Inc. (Mission) and Mercy General Hospital (Mercy) proprietary hospitals (operated for profit) located in southern California. In order to convert vast amounts of money to his own purposes Cella engineered and participated in schemes involving the use of false invoices, padding hospital payrolls, misuse of hospital funds, misuse of hospital employees and violation of his own fiduciary duties owed as a corporate officer to the two hospitals. Cella by this scheme filched approximately $3 million from Mercy and Mission. In addition, his presentation of false claims resulted in an approximately $140,000 loss to Medi-Cal.

Any comprehension of the current appeal requires a brief review of relevant facts and proceedings covering a several-year period preceding Cella's grand jury indictment.

In late 1974 and throughout most of 1975, a series of widely publicized accusatory statements were exchanged between Cella and the Orange County District Attorney. During 1975 three separate investigations of Cella and his business interests were begun: the first was an audit of Mission authorized by

---

[1]Cella was charged on counts one and two with conspiracy to violate Penal Code sections 484-487, subdivision 1, 504, 506 and 514 (theft and embezzlement) in violation of Penal Code sections 182, subdivision 1 and 182, subdivision 4. Counts three and four charged Cella with conspiracy to violate Penal Code section 72 (presentation of false claims) in violation of Penal Code sections 182, subdivision 1 and 182, subdivision 4. In counts five through fifty-nine, Cella was charged with forgery (Pen. Code, § 470). In counts 60 through 119 and in counts 123 through 125, he was charged with theft (Pen. Code, §§ 484-487). Counts 120 through 122, 126 and 127 charged presentation of fraudulent claims (Pen. Code, § 72).

the hospital's board of directors; a second investigation was carried out by the office of the District Attorney, Orange County; a third was conducted by the Intelligence Division of the United States Internal Revenue Service—commencing on July 2, 1975.[2]

Robert Zunich was the controller at Mission in October 1971. He later became executive controller at both Mission and Mercy. Beginning in Mission's first fiscal year of operations, Cella instructed Zunich to issue checks to various businesses. Cella informed Zunich to whom the check was payable, the amount, and how the expense was to be reflected on the hospital books. This procedure deviated from normal hospital business practice. The checks were usually drafted in favor of business entities—later discovered to be sham companies—whose accounts were controlled by Cella. Zunich repeatedly requested backup documentation from Cella but was either put off or told it would be forthcoming.

Zunich confronted Cella after Mission's first fiscal year records showed some $325,000 of undocumented expenses. Cella admitted to Zunich that $107,000 of that amount was political expenses and signed a note for that amount to the hospital partnership and directed Zunich to make covering entries in Mission's financial records.

Between September and October 1975, Zunich prepared two lists setting forth irregular expenditures at Mission between November 1972 and October 1974. These lists were *prepared at the direction* of Mission's board of directors. The irregular transactions were listed on these schedules by check number, payee and amount. Transactions involving six of the ten companies identified on the Ray (illegally obtained) negatives and pasteups were described on these schedules.

In 1972 Stephen Evans[3] was in charge of the print shop at Mission. During that, an election year, the print shop, pursuant to Cella's directives, began printing a large amount of political materials. Two commercial printing presses were ordered, costing $20,000 each. The amount of paper consumed rose from approximately 15,000 sheets per month to about 7 million sheets for the months of April, May and June. Extra employees were hired and placed on the hospital payroll but were in fact working on political printing. The print shop political activities required a move to larger quarters in Costa Mesa. Its expenses continued to be paid by the hospital.

Don Ray was an employee of the print shop. In 1975 he was arrested by Orange County police for solicitation of murder of his wife. In these cir-

---

[2]See *United States* v. *Cella* (9th Cir. 1977) 568 F.2d 1266, 1270-1273, for a detailed account of Cella's unlawful activities that resulted in his conviction of various federal crimes, including conspiracy, mail fraud, tax evasion and other offenses.

[3]Evans was one of the defendants convicted in the federal case. (See *United States* v. *Cella, supra,* 568 F.2d 1266.)

cumstances he agreed to become an informant against Cella and to act on behalf of the district attorney in securing evidence of Cella's guilt. On August 4, 1975, at the direction of the district attorney's office, Ray searched the print shop and seized papers relating to invoices for 10 nonexistent companies including "pasteups and negatives" of blank invoices for the companies.

On October 21, 1975, the Orange County District Attorney's office was contacted by an attorney who related he had a client who was a ranking member of the administrative staff of Mission. The attorney said his client possessed extensive information and documentation concerning the commission of a crime involving thefts of funds from Mission and Mercy and wished to disclose the same to the district attorney.

Following discussions between the attorney and the district attorney's office, it was agreed the "client" would receive immunity if he would testify for the prosecution. The identity of the witness, Robert Zunich, was then disclosed. *Up to this point in time, Zunich had not provided any information to the district attorney's office.* Zunich had cooperated, at the direction of the hospital board, with the IRS investigators who examined hospital records pursuant to a subpoena. Zunich provided the district attorney with detailed and comprehensive information pertaining to fraudulent accounting practices of Mission, Mercy, and other related entities. Zunich told investigators of numerous hospital checks made payable to nonexistent companies and to legitimate companies pursuant to fraudulent invoices.

Zunich showed the district attorney numerous documents, including a series of invoices representing transactions for which the usual and necessary documentation was lacking. Zunich had compiled these documents over the years from both Mission and Mercy records. The documents surrendered included the schedule of irregular payments Zunich prepared during September and October of 1975. Zunich prepared cost abuse sheets since 1971 containing ledger sheets and names of companies involved. With the consent and approval of the hospital board of directors, Zunich developed numerous records of irregular transactions in the year 1972-1973. These records were the substantial source for the affiant (Sears) on the challenged search warrant. These same documents had been made available to IRS investigators by the hospital authorities. Witness Ouellet, at Zunich's direction, also cooperated with the district attorney in preparing the search warrant affidavit. Ouellet delivered incriminating papers and reported the lack of evidence as to receipt of any merchandise paid for by the "phoney" invoices. Ouellet came forward "voluntarily." Following the issuance and execution of the search warrants, several thousand documents were obtained pointing unmistakably to Cella's diversion of hospital and Medi-Cal funds to his own purposes.

The 127-count indictment by the Orange County Grand Jury followed on January 12, 1976.

## The Legal Procedures

Cella's first Penal Code section 1538.5[4] motion to suppress evidence was denied. He appealed. This court declared the Ray (Aug. 4, 1975) search and seizure unlawful and remanded the cause (*People* v. *Cella, supra,* 4 Crim. 8913; pet. for hg. den. June 14, 1979), without prejudice, for further proceedings in the superior court to determine whether other evidence of Cella's guilt was tainted by the unlawful search. Back in the trial court Cella filed a "motion to determine whether he would be permitted to make a motion to suppress evidence." The trial court denied the motion on the grounds his motion to suppress evidence was not timely made and it had once been heard. Cella then entered a guilty plea and obtained a certificate of probable cause and appealed a second time to this court claiming he was never afforded a full and fair suppression hearing after this court had ruled the August 4 search and seizure unlawful. This court agreed, declaring Cella had not had the opportunity to litigate the search and seizure questions other than the legality of the August 4 search.

The cause was again remanded, this time for a "complete hearing on the suppression issue."[5] (*People* v. *Cella* (1981) 114 Cal.App.3d 905, 922 [170 Cal.Rptr. 915].) On remand, Cella argued evidence seized pursuant to search warrants issued several months after the August 4 search was the product of the August 4 search and therefore, a fruit of the poisonous tree which must be suppressed. After an extensive hearing, the trial court found the evidence was not tainted by the August 4 search and denied Cella's section 1538.5 motion. Cella's guilty plea and sentence were deemed (by agreement) to have remained in effect. Cella brings this, his third appeal.

The prime issue on this appeal is whether substantial evidence supports the trial court's finding the evidence challenged in the section 1538.5 proceedings was not tainted by the unlawful Ray search of August 4. Cella articulates a general complaint to the effect the People have not carried their burden of proof. But at the heart of Cella's contention is the assertion he has proved evidence of "taint." He claims *Zunich* was *produced* via a *grant* of immunity which in turn was triggered, induced and based upon the prosecutor's

---

[4]All statutory references are to the Penal Code unless otherwise specified.

[5]This court observed: "Logically, the trial court, having once concluded the 'keystone' search was valid, never had any reason to consider the taint as to any other search, for there was in that court's view, no 'poison tree' from which the fruit might derive any taint. . . . Nevertheless, whether the court intentionally or inadvertently failed to rule on the remaining merits of the section 1538.5 motion, Cella must receive a full and complete hearing." (*Cella,* 114 Cal.App.3d at p. 914.)

(Brice's) knowledge of the documents *Ray* produced in the illegal August 4 print shop seizure: if Ray's seizure was not the source of the immunity offer, Brice was buying a "pig in a poke," because "[t]he grant of immunity was nothing short of incredible." Cella also asserts Zunich came forward because the IRS subpoena of October 8, 1975, directed production of the hospital's financial record and thereby caused him to fear for his own legal safety. Cella asserts, without factual citation, the IRS subpoena was based upon knowledge the federal tax officials obtained from the illegal seizure of print shop materials. Cella's assertions are mere hypothesis; no fact basis supports them.

## DISCUSSION

### I

A preliminary matter requires disposition. The Attorney General asks this court to reconsider its ruling the August 4 search and seizure illegal, arguing judicial review is not precluded by the law of the case doctrine because this court did not address all the points briefed by the Attorney General in the earlier appeal. Second, it is urged errors of fact appear in that first appeal. Finally the addition of article I, section 28, subdivision (d) to the California Constitution (Prop. 8) represents an intervening change of law.

■ We decline the Attorney General's invitation to reconsider the legality of the August 4 search. These matters were fully litigated factually and legally in both of the earlier appeals, upon petition for rehearing in the second appeal before this court and in petition for hearing before the Supreme Court. Furthermore, both appeals are final, both were correctly decided on the law at the time it became final. The Attorney General directs us to no authority requiring our application of Proposition 8 to appeals which were final before the Constitution was amended. (See *People* v. *Barrick* (1982) 33 Cal.3d 115 [187 Cal.Rptr. 716, 654 P.2d 1243].)

Furthermore, as will appear, adherence to our earlier opinion does not result in an unjust decision. In *People* v. *Shuey* (1975) 13 Cal.3d 835, 846 [120 Cal.Rptr. 83, 533 P.2d 211], the Supreme Court stated: "We do not propose to catalogue or to attempt to conjure up all the possible circumstances under which the 'unjust decision' might validly operate, but judicial order demands there must at least be demonstrated a manifest misapplication of existing principles resulting in substantial injustice before an appellate court is free to disregard the legal determination made in a prior appellate proceeding."

### II

Cella's motion sought to prohibit the introduction into evidence of approximately 5,000 exhibits obtained by virtue of 24 search warrants executed *after*

the Ray August 4 search. The trial court denied Cella's motion to suppress upon grounds the evidence objected to was the not product of, or exploitation of, or tainted by the August 4 search.

The trial court made several specific findings of fact to support its conclusions. Cella challenges these "verdicts," contending the People did not meet their burden of proof. ■ Upon such contention, we review the record to ascertain whether substantial evidence supports the factual findings of the trial court. In making such examination, we are required to and do construe the evidence in the light most favorable to the trial court's finding and presume the existence of all inferences the trial court could reasonably have deduced from the evidence. (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]; *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].)

The trial court specifically found:

First, Robert Zunich prepared cost abuse sheets for the period between 1970 and 1975.

Second, Dr. Ross became the hospital administrator after the beginning of August 1975. Ross testified he had upwards of 100 conversations with Zunich about questionable transactions Zunich had reported in the cost abuse sheets.

Third, at least one to two weeks before September 4 (the date of the IRS summons) a conversation between Ross and Zunich occurred. Zunich told Ross "I'm scared to death. I'm in the middle of it. I'm going to get hung. I need a damn good attorney to keep it from happening."

Fourth, Zunich attended a board meeting on September 9 at which an internal audit (Gagerman) report was presented and he became aware of the contents of that report. The report referred to questionable expense items which were the subject of the conversation between Ross and Zunich and connected Zunich to the preparation of the cost abuse sheets.

Fifth, Cella called Zunich on October 14 or October 20 and warned him to get a lawyer in regards to a criminal process, not a tax question.

Sixth, Zunich was granted immunity on October 31 and that became the basis for the search warrant of November 21, 1975.

On the basis of these findings, the trial court concluded information obtained from Zunich was not a product of the IRS summons which was not in turn tainted by the illegal search of August 4. The trial court concluded the IRS had

ample information in its possession unconnected to the search conducted on August 4. In support of its factual conclusions, the trial court listed specific dates, documents and testimony showing the IRS had already determined to reopen the investigation separate and apart from information available after the August 4 search. The trial court found this evidence to be uncontradicted. Upon this factual base the trial court concluded Cella failed to show the evidence obtained from Zunich, and the execution and later search warrants were the result of any exploitation of the primary illegality.

■ Cella has the intital burden to establish cause and effect, showing an exploitative nexus, between the challenged evidence and the primary illegality. Only after meeting this burden, would the burden of proof shift to the prosecution to persuade the trier of fact the evidence was purged of the primary taint. (*Nardone* v. *United States* (1939) 308 U.S. 338, 341 [84 L.Ed. 307, 311-312, 60 S.Ct. 266]; *Alderman* v. *United States* (1969) 394 U.S. 165, 183 [22 L.Ed. 2d 176, 192, 89 S.Ct. 961]; *People* v. *Johnson* (1969) 70 Cal.2d 541, 554 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366].)

In *People* v. *Johnson,* the Supreme Court stated: "[T]he defendant must establish a relationship between the unlawful act and objected to evidence or confession." (70 Cal.2d 541, 554.) The issue of attenuation does not arise except as a *defense* to "the premise that the challenged evidence is in some sense the product of illegal government activity." (*United States* v. *Crews* (1980) 445 U.S. 463, 471 [63 L.Ed. 2d 537, 545, 100 S.Ct. 1244].) "However, once [a] defendant has done so, the burden is then on the prosecution under *Nardone* [308 U.S. 338] to show that 'its proof had an independent origin' . . . ." (*Johnson,* at p. 554.) Likewise, in *People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406, 411 [118 Cal.Rptr. 617, 530 P.2d 585], the court stated: "Once a defendant establishes a relationship between evidence and unlawful police activity, the People must prove the taint was purged."[6]

■ It is not the rule that evidence must necessarily be suppressed if it would not have come to light *but for* the illegal actions of the police. (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].) The question is, rather, whether the evidence was acquired by exploitation of

---

[6]*People* v. *Coleman* (1975) 13 Cal.3d 867, 890-891, footnote 20 [120 Cal.Rptr. 384, 533 P.2d 1024], explains the procedural burdens of the respective parties in this fashion: "[T]he following propositions may be distilled from the available authority:

"The defendant generally bears the burden of proving that some sort of official misconduct has occurred [citations] . . . .

"Once the fact of official misconduct has been established, the defendant also bears the burden of establishing a prima facie causal link between the 'primary illegality' and any secondary evidence allegedly derived therefrom. [Citations.]

"If the defendant meets this burden of 'go[ing] forward' [citations], it is the prosecution's burden to prove either the attenuation of the taint of the primary illegality or the independent origin of the prima facie-tainted evidence. [Citations.]"

the initial illegality or through means sufficiently "attenuated as to dissipate the taint." (*Nardone* v. *United States, supra,* 308 U.S. 338, 341 [84 L.Ed. 307, 311].) What constitutes "exploitation" on the one hand and what fact or facts will lead a court to say the taint has become attenuated, cannot be determined by pressing a button: "the answer depends on reason and precedent." (*People* v. *Thomas* (1980) 112 Cal.App.3d 980, 986 [169 Cal.Rptr. 570]; *People* v. *Williams* (1970) 8 Cal.App.3d 44, 49, 50 [86 Cal.Rptr. 821].)

In *Nardone* v. *United States, supra,* 308 U.S. 338, 341 [84 L.Ed. 307, 311-312, 60 S.Ct. 266, 268], Mr. Justice Frankfurter explained: "Here, as in the *Silverthorne* case, the facts improperly obtained do not 'become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it' simply because it is used derivatively. [Citation.]" (*People* v. *Saam* (1980) 106 Cal.App.3d 789, 797 [165 Cal.Rptr. 256]; *People* v. *Garay* (1967) 247 Cal.App.2d 833, 837 [56 Cal.Rptr. 55].)

In *People* v. *Teresinski* (1980) 26 Cal.3d 457, 464 [162 Cal.Rptr. 44, 605 P.2d 874], the Supreme Court held: " '[T]o remove the taint from evidence obtained directly as a result of unlawful police conduct requires at least an intervening independent act by the defendant or a third party which breaks the causal chain linking the illegality and evidence in such a way that the evidence is not in fact obtained "by exploitation of that illegality." ' " (Quoting *People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal.Rptr. 409, 439 P.2d 321].)

## III

■ Cella contends there is that necessary causal link between the IRS August 8, 1975, summons and the August 4 Ray search. A brief review of evidence supports the conclusion an IRS investigation was being conducted totally independent of the district attorney's investigation. The IRS inquiry into Cella's income tax filing history began on June 27, 1975. This inquiry revealed certain irregularities, and on July 2, 1975, the tax investigator was given an assignment to conduct further investigation into the tax history and status of Cella and the various business entities with which he was associated. The investigation was particularly active during July 1975; on July 10, a special agent was supplied with information about Cella, including a chart on the relationship between Cella and certain business entities; on July 18, a special agent discovered Cella and a number of these businesses had not filed tax returns; the agent requested information on tax returns from Mercy and Mission; on July 28, a meeting organized by the IRS was held between the special agents, district attorney investigators, and deputy attorneys. *The IRS agent did not then know of Donald Ray's existence.* The district attorney investigator, however, *may have mentioned* the possibility of "phoney" invoices having been used by

Cella. *The IRS was not provided with the information obtained in the August 4 search until August 8.*

After the July 28 meeting and before the August 8, the IRS agent who had conducted the inquiry requested the investigation be widened and that a closed tax investigation be reopened. IRS agents interviewed Cella on August 7 and attempted to contact the person who had prepared Cella's tax returns.

These facts compel our conclusion the decision to launch a full-scale investigation was made by the IRS before it received the information obtained by Ray on August 4 and was uninfluenced by reference to "phoney" invoices during the meeting on July 28. More than substantial evidence supports the court's factual conclusion that the IRS subpoena for the hospital records was not the product of Ray's seizures. The IRS investigative activities constituted an independent source for the November 12 district attorney search warrant affidavits.

## IV

Cella's contention that Zunich came forward as a witness as a direct result of the IRS October 8 subpoena for hospital records also lacks merit for these reasons: As detailed above, the IRS subpoena derived from a mountain of independent evidence developed by a federal tax investigation wholly independent of the August 4 seizure. Thus if Cella's assumption be accepted that the IRS subpoena triggered Zunich's coming forth seeking immunity in return for evidence, then that triggering mechanism is an untainted source.

Secondly, more than sufficient evidence supports the trial court conclusion Zunich was not the product of the IRS October 8 subpoenas. The following are but a few of the facts that support a conclusion that Zunich was not a "tainted" witness: Approximately two years before the August 4 search Zunich began preparing lists of irregular transactions involving the hospitals and the nonexistent companies. An independent certified public accounting firm began an audit almost one year before the August 4 search. The auditor's final report was presented to the hospital board of directors on September 9, 1975. The hospital's corporate counsel had reviewed drafts of this report several months earlier. The report concluded certain named companies had received improper payments from the hospital. Zunich had informed corporate counsel that improper expenditures to nonexistent companies may have occurred.

Approximately one week after a September 9, 1975, board meeting Zunich offered to cooperate in any investigation into hospital expenditures with a view toward obtaining immunity if he was found to be criminally culpable. Zunich had almost daily conversations with the chairman of the board of Mission dur-

ing the months of August, September and October 1975. Zunich met with the district attorney and received an immunity agreement on October 31, 1975, *shortly after he was advised by Cella to get an attorney.* Zunich came forward as a witness from this complex of knowledge and activity and gave the district attorney's office the information which was used in preparing the search warrant affidavit in November 1975. Our independent review of the record reveals ample testimony which demonstrates Zunich came forward out of fear for his own possible involvement in financial irregularities extending over years of time.

## V

Cella next argues *the district attorney's grant of immunity* in order to gain information from Zunich was the product of his *"tainted" knowledge* gained in the August 4 search and therefore Zunich is a "tainted witness."

If it be assumed arguendo there is *factual* merit in Cella's contention (and this assumption is not grounded in the evidence), the *legal* relevancy to prove *exploitation* has yet to be shown. *The precise question is whether witness Zunich and/or his tesimony is the product of an exploitation of the fruits of Ray's seizures.* The district attorney's state of knowledge or undisclosed subjective purposes cannot by some symbiotic process be imputed to Zunich, thereby causing him to become a *"tainted" witness.* The record reviewed above factually demonstrates Zunich made his offer and sought immunity for his own reasons. The details he gave did not have their source in the Ray seizures. Assuming the district attorney's motivation is "tainted" from an illegal source, Zunich's totally voluntary offer to testify is an independent intervening act. (Cf. *Mann* v. *Superior Court* (1970) 3 Cal.3d 1, 8 [88 Cal.Rptr. 380, 472 P.2d 468]; *United States* v. *Ceccolini* (1978) 435 U.S. 268 [55 L.Ed.2d 268, 98 S.Ct. 1054].) This issue is not whether there is any connection to illegal police action but instead the extent to which the connection is "direct and significant." (*Wong Sun* v. *United States, supra,* 371 U.S. 471, 488 [9 L.Ed.2d 441, 455].) There is no evidence of any direct and significant relationship between the district attorney's state of mind and Zunich's willingness to testify.

## VI

In his final argument in support of the contention the November 12 search warrant was a product of the August 4 search, Cella refers to the testimony of an expert, a mathematician, to prove his point. This witness testified the mathematical chances were 2 or 3 in 100,000 that the list of 10 companies found in the November 12 warrant affidavit would be in the same order as the list of companies supplied by Ray after the August 4 search. The People presented evidence to the effect the information for the supporting affidavits was supplied by Zunich, Robert Ouelette, assistant controller at Mission and

Mercy, by company officers with General Hospital Supply, Sherer Company and American Hospital Supply Company, by medical staff and by the Rhode Island Commissioner of Corporations. Attached to the search warrant affidavit were copies of the fake invoices and indorsed payment checks. A purchasing agent for Mission told the affiant that items listed in the invoices had never been ordered or received by the hospitals. *Ray's participation in the preparation of the November 12 search warrant included identification of the invoices supplied to the district attorney by Zunich.* Ray also recognized the invoices as items he had printed at Mission's print shop. The names of the companies listed in the warrant were drawn from the indictment and from cost abuse sheets and other materials supplied by Zunich. The drafter (Sears) of the affidavit positively testified the list of companies was not taken from matters obtained in the search conducted on August 4. "[It's] more than a recollection . . . it's a certainty" said Sears.

Cella argues since the mathematical odds are 2 or 3 in 100,000, the order of 10 random items would be duplicated with only 1 item out of sequence, the list of companies compiled by Ray on August 4 *must* have been used in drafting the search warrant affidavit on November 12. The trial court impliedly found this singular evidence of statistical improbability insufficient to connect the November 12 affidavit to the August 4 search.

The interjection into criminal proceedings of sophisticated theories of mathematical probability raises a number of serious concerns. As the California Supreme Court has stated: "Mathematics, a veritable sorcerer in our computerized society, while assisting the trier of fact in the search for truth, must not cast a spell over him." (*People* v. *Collins* (1968) 68 Cal.2d 319, 320 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].)

The Supreme Court of Minnesota was most critical of such evidence, saying: "Testimony expressing opinions or conclusions in terms of statistical probabilities can make the uncertain seem all but proven, and suggest, by quantification, satisfaction of the requirement that guilt be established 'beyond a reasonable doubt.' [Citation.] Diligent cross-examination may in some cases minimize statistical manipulation and confine the scope of probability testimony. We are not convinced, however, that such rebuttal would dispel the psychological impact of the suggestion of mathematical precision, and we share the concern for 'the substantial unfairness to a defendant which may result from ill conceived techniques with which the trier of fact is not technically equipped to cope.' " (*State* v. *Carlson* (Minn. 1978) 267 N.W.2d 170, 176; fn. omitted.)

Because of the danger that such evidence could mislead or confuse the jury, the *Carlson* court concluded an expert's testimony regarding the mathematical probability of certain hairs belonging to someone other than the defendant was improperly received.

For full and critical discussions of the use of statistical probability in the trial process, see Finkelstein & Fairley, *A Bayesian Approach to Identification Evidence* (1970) 83 Harv.L.Rev. 489; Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process* (1971) 84 Harv.L.Rev. 1329, 1339-1344; Finkelstein & Fairley, *A Comment on "Trial by Mathematics"* (1971) 84 Harv.L.Rev. 1801; and Tribe, *A Further Critique of Mathematical Proof* (1971) 84 Harv.L.Rev. 1810.

Both jurists and scholars note the danger of enticement posed to the trier of fact by the seemingly scientific, intellectual mathematics machine. Such technique blindly overlooks such profound problems of integrating mathematic purity with the countless nonmathematic variables that exist in reality. It quantifies with deceptive exactitude "fuzzy imponderables." If mathematical probabilites are to be of any use in the courtroom setting, *all crucial variables must be quantified exactly.*[7] Cella's attempt at proof of fact by use of mathematical probabilities has left out a host of "soft variables"—those factors to which meaningful numbers are hardest to attach. (Tribe, *Trial by Mathematics, etc.*, *supra,* pp. 1361-1366.)

There could be any number of reasons, not quantified by the mathematician, why 10 corporate names would appear twice in the same order.[8] Our duty does not include speculation as to the quality of proof to be gained from misapplied statistics. The trial court has found, based on substantial evidence, factual basis for issuance of the November 12 search warrant. Speculation in the area of mathematical probability does not stay performance of our duty to sustain a finding of fact supported by more than substantial evidence. Pseudoscientific speculations in the area of mathematical probabilities offer a prime subject for exclusion under Evidence Code section 352.

CONCLUSION

Cella has had more than his full day in court since August 18, 1976, when he first moved to suppress evidence pursuant to Penal Code section 1538.5. In Cella's second appeal, we observed "had the court made findings we would be able to short cut what has become an appellate ping-pong game and rule once

---

[7]The mathematician here concedes if he took into account the differences in spelling between the names of the companies on the November 12 list and those found in the August 4 search, his opinion on probabilities would not be valid and might be irrelevant.

[8]Separate inquirers looking at the same set of records could most logically report the corporate names in the same sequence as set out in the record examined. Ray may have observed a list of nonexistent corporations prepared over the previous four years by Zunich. Zunich and the IRS investigators investigated the same sequentially arranged records. Ray may have followed the same system.

and for all on the legality of the searches and seizures." (*Cella, supra,* 114 Cal.App.3d 905, at p. 914.)

The Ray August 4 "Tenco" list needs be located in its relatively insignificant place as a molehill in a mountain of evidence produced by Zunich, Ouellete, Frank Soldo, innumerable IRS employees who with lawful warrant went through the hospital records and members of the hospital corporate staff. Thus, not one but several untainted witnesses gave the district attorney's office the detail, the book and page, the documentation of several years of corporate filching by Cella.

The Ray list of 10 "phoney" companies adds nothing to the invoices, purchase orders, checks, delivery records and receipts or to the direct eyewitness testimony of undelivered merchandise and payments made without any supporting documentation.

Secondly, the search warrant affiant (Sears) had Ray present at the preparation stages. Ray identified invoices—supplied by other sources—as being printed in the hospital print shop. There is no claim that Ray was procured as a *witness* as a result of any impropriety. Ray is not a "tainted witness." (See Ruffin, *The Tainted Witness* (1967) 15 UCLA L.Rev. 32, 38.) His observations were made while a print shop employee was lawfully present on the premises. Concededly Ray was an "untested informant" as to matters related to the affiant. Yet he was corroborated by Sordo. He was taken before the issuing magistrate and examined. (*Theodor* v. *Superior Court* (1972) 8 Cal.3d 77, 86, fn. 4 [104 Cal.Rptr. 226, 501 P.2d 234].)

The trial court considered all of the foregoing evidence and made specific findings on critical issues. Each of these findings is supported by substantial evidence. We conclude: The search warrants issued after August 4, 1975, be they either of federal or state court origin, were not the product of or the result of an exploitation of the fruits of Ray's illegal print shop search.

Judgment affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 20, 1983.