[No. B004743. Second Dist., Div. Two. June 15, 1984.]

THE PEOPLE, Plaintiff and Appellant, v.
JOHN RICHARD BELLOMO, Defendant and Respondent.

## COUNSEL

Ira Reiner, City Attorney, Jack L. Brown and Arthur B. Walsh, Deputy City Attorneys, for Plaintiff and Appellant.

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Gerald T. Richardson and Chloris A. deBrauwere, Deputy Public Defenders, for Defendant and Respondent.

## OPINION

**GATES, J.**—Under rule 62 of the California Rules of Court, we here review a municipal court's dismissal of a criminal proceeding based upon its decision suppressing all evidence of defendant John Bellomo's potential guilt. It had been charged that Bellomo again had driven a motor vehicle while under the influence of alcohol or drugs after he had committed similar offenses on September 3, 1980, and December 26, 1980, respectively.

The determinative facts are not in dispute. At approximately 9 p.m. on October 29, 1982, Lewis Robinson, a Los Angeles police officer assigned to traffic enforcement, observed a vehicle driven by defendant when the officer passed within three to four feet of it on his motorcycle as he made a right turn from Van Nuys Boulevard onto Vanowen Avenue. This is a brightly lit intersection and the defendant's car was the third in a line that waited on Vanowen facing a red traffic control signal.

The officer testified that when he first noticed defendant, "his hair was a little bit more a mess, his head was tilted to the left, and as I saw it resting on the window, and his eyes were—appeared to be closed." He "thought it was very strange for the driver of the vehicle to be in this condition in a moving lane of traffic, and I thought there was possibly something physically or mentally wrong." He, therefore, "decided to make a U-turn and come in behind and stop the defendant and see if there was anything the matter." He further explained, "Due to my 17 years of experience, when I see a person which I assume to be in a—to look unnormal, that being,

maybe asleep, resting in a moving vehicle, to stop him just to investigate to see if there is something wrong with him."

We perceive no impropriety in the officer's decision and, in fact, to have failed to investigate the situation would have been quite inconsistent with his assigned duties. Whether the faculties of one who operates a ton of steel upon the public highways are impaired from lack of sleep, or as the result of some illness or due to his voluntary consumption of a toxic substance that causes him to become "intoxicated" is a matter of no concern to those unfortunate enough to find themselves in his path. In fact, as to the voluntarily disabled driver our Supreme Court recently observed: "The drunk driver cuts a wide swath of death, pain, grief, and untold physical and emotional injury across the roads of California and the nation. The monstrous proportions of the problem have often been lamented in graphic terms by this court and the United States Supreme Court. (See *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 898-899 . . . [quoting U.S. Dept. Health, Ed. & Welf., 3d Special Rep. U.S. Cong. on Alcohol and Health (1978)]; *South Dakota* v. *Neville* (1983) 459 U.S. 553, 558 . . . [describing the 'tragic frequency' of the 'carnage caused by drunk drivers']; *Mackey* v. *Montrym* (1979) 443 U.S. 1, 17-18 . . . .) As observed in *Breithaupt* v. *Abram* (1957) 352 U.S. 432 . . ., '[t]he increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield.' (*Id.*, at p. 439 . . . .) Indeed, in the years 1976 to 1980 there were many more injuries to California residents in alcohol-related traffic accidents than were suffered by the entire Union Army during the Civil War, and more were killed than in the bloodiest year of the Vietnam War. (Compare Cal. Highway Patrol, 1980 Ann. Rep., Fatal & Injury Motor Vehicle Traffic Accidents, p. 2, tables 1a, 1b, 1c, 1d, and p. 58, tables 6a, 6b, with Statistical Abstract of U.S. . . . p. 361, tables 598, 599.) Given this setting, our observation that '[d]runken drivers are extremely dangerous people' (*Taylor* v. *Superior Court, supra,* 24 Cal.3d 890, 899) seems almost to understate the horrific risk posted by those who drink and drive." (*Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 262 [198 Cal.Rptr. 145, 673 P.2d 732].)

Of course, if each of our police officers had the facile descriptive powers of a Charles Dickens or a Thomas Wolfe, he might spontaneously paint a verbal picture that would make unmistakably manifest why a particular drowsy driver's appearance moved him to immediate action. However, as pointed out in *People* v. *Gale* (1973) 9 Cal.3d 788, 795-796 [108 Cal.Rptr. 852, 511 P.2d 1204], "Significantly, we note that '[e]xperienced police officers naturally develop an ability to perceive the unusual and suspicious which is of enormous value in the difficult tasks of protecting the security and safety of law-abiding citizens. The benefit thereof should not be lost

because the cold record before a reviewing court does not contain all the particularized perceptions which may have been so meaningful at the scene.' [Citation.]"[1]

In our present proceeding, the trial court in precluding the prosecution from introducing any evidence regarding defendant's physical state after he had been halted, stressed the fact that stopping a motor vehicle even for the most commendable of investigative reasons, still constitutes a form of "detention." This is true, of course, for it is unlawful for a driver to ignore such an official directive. (See Veh. Code, § 2800.1.) However, it is also a necessary precedent to any investigation for, unlike a pedestrian, it is impossible truly to check the condition of anyone while he remains encased in a moving object. Fortunately this does not preclude our officers from performing their duties. Paraphrased, our observations in *People* v. *Lara* (1980) 108 Cal.App.3d 237, 241 [166 Cal.Rptr. 475], regarding search and seizure are equally apposite here: "It should always be borne in mind that the constitutional proscription against unreasonable [detention], and the judicial rules promulgated in support thereof, are designed to protect the innocent citizen, not the criminal. It is true, of course, that only the guilty profit *directly* from the exclusionary rule. However, it is assumed that over the long run the law abiding members of society will benefit from that curtailment of excessive police conduct that it is hoped will result from the application of such rule. In essence, the criminal is but an unavoidable 'third party beneficiary' of the compact effected between the governed and their government.

■ "As a consequence, given a situation supplying probable cause to believe [someone's condition should be investigated], one measure to be utilized in fixing the parameters of permissible police conduct designed to resolve the question is to be found in the determination of the amount of fear, physical trauma, embarrassment, indignity, etc., to which an innocent person would necessarily be subjected before his innocence could be clarified.[2] . . ." Footnote 2 reads as follows: "The 'need for swift action' and the 'seriousness of the offense' involved are also 'highly determinative factor[s] in any evaluation of police conduct. . . .' (*People* v. *Johnson* (1971) 15 Cal.App.3d 936, 940-941 . . . .)"

The operation of a motor vehicle by a driver disabled for *any* reason, be it a disability that is statutorily prohibited or not, is manifestly a "serious" event and the "need for swift action" is clear beyond cavil. Of course,

---

[1]In so observing, we do not mean to disparage this officer's potential verbal abilities. Regrettably, as is so often the case, neither court nor counsel asked Officer Robinson to expand upon his initial laconic description of defendant's appearance in the event they deemed it too conclusional.

should it further chance that a driver whose appearance suggests a problem actually is engaged in a proscribed activity such fact would not afford him greater rights than otherwise would be his due. That is, while those suspected of violating the rules by which a society governs itself are, as above stressed, entitled *to exactly the same* quantity and quality of rights as are their innocent fellows, they are entitled to no *greater* freedoms.

We cannot believe that any rational citizen who appeared to be physically or mentally impaired, albeit for ever so innocent a reason, would be unwilling to undergo the minor annoyance of a traffic stop in order to protect his own life and the lives of his fellows by diminishing the bloodying of our highways. As our former colleague Justice Macklin Fleming noted with regard to a related, albeit less serious, situation: ■ ". . . When circumstances demand immediate investigation by the police, the most useful, most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.

"From the point of view of the person detained, temporary detention clearly amounts to some deprivation of his personal freedom of movement. Yet freedom is not absolute, and rights are correlative to duties. The temporary loss of personal mobility which accompanies detention may be deemed part payment of the person's obligation as a citizen to assist law enforcement authorities in the maintenance of public order, an obligation reflected in the operation of such traditional institutions as the sheriff's posse, the hue and cry, etc. (Pen. Code, § 150; Gov. Code, § 26604.) Nor should the deprivation of his freedom of movement be considered all loss by the person detained, for in fulfilling his obligation as a citizen he is also serving his own interest. The person detained has two interests at stake, his specific interest in unrestricted freedom of movement, and his general interest as a member of the community in the preservation of public peace and tranquility. In clearing himself of suspicion and releasing the police for other duties connected with the maintenance of public peace he is broadly serving his general interest as a citizen. Although in times of tranquility he tends to assume that his first interest is paramount and his second one inconsequential, times are not always tranquil, and the persistence of crime and civil disorder serves as a continuing reminder of his substantial and direct interest in public peace, for whose preservation he must at times make some personal sacrifice." (*People* v. *Manis* (1969) 268 Cal.App.2d 653, 665-666 [74 Cal.Rptr. 423].)

■ In the present instance the trial court repeatedly stressed its belief that to justify any "detention" there must be probable cause to believe

"*criminal* activity" (italics added) is involved. However, there are many "innocent," i.e., noncriminal, conditions that pose grave peril to others. In *In re Tony C.* (1978) 21 Cal.3d 888, 895-896 [148 Cal.Rptr. 366, 582 P.2d 957], our Supreme Court summarized the applicable law in this respect as follows: "A more fruitful approach focuses on the purpose of the intrusion itself. If the individual is stopped or detained because the officer suspects he may be personally involved in some criminal activity, his Fourth Amendment rights are implicated and he is entitled to the safeguards of the rules set forth above. But similar safeguards are not required if the officer acts for other proper reasons. Such reasons are obviously too many and varied to recite, but they may be grouped in at least two general categories: (1) the officer may wish to question the person not as a suspect but merely as a witness to a crime, or (2) the officer may be engaged in one of 'those innumerable miscellaneous tasks which society calls upon police to do which have nothing to do with the detection of crime' [citation], such as giving aid to persons in distress, mediating domestic quarrels, assisting the elderly or the disabled, furnishing traffic advice or directions, and generally preserving the peace and protecting persons from harm or annoyance. [Citation.]"

The court also commented on the fact that after Officer Robinson had activated his vehicle's red light, defendant had "parked at the curb, and he looked around as though fully aware. It was very normal driving."[2] However, just as a search may not be justified by its fruits, neither may the propriety of a detention be determined by the manner in which the party detained responded to the officer's direction. Once a command has been made, disobedience cannot vindicate it nor obedience invalidate it. Moreover, since here the court, not unreasonably, refused to receive any evidence concerning those events that transpired after defendant's vehicle had come to rest, it is not impossible that defendant fell flat on his face in a drunken stupor as he valiantly but vainly sought to exit. We do not mean to suggest that such was the case; we merely emphasize that the correctness of a challenged traffic stop ordinarily cannot be affected by either the good or the evil the detainee may do *after* the signal to halt has been given.

*Batts* v. *Superior Court* (1972) 23 Cal.App.3d 435, 439 [100 Cal.Rptr. 181] contains former Justice Robert Gardner's most excellent discussion of the myriad of delicately distinct relationships that arise between our peace officers and ourselves, some of which constitute classic criminal "detentions," others mere "contacts" and still others for which no specific legal

---

[2]It had taken Officer Robinson a moment to complete his U-turn. He testified that "[a]s I [then] approached [defendant's car] from the rear, going through the traffic, the light went to green, and as we went through the intersection I placed the red lights on him and stopped him approximately 150 feet east of Van Nuys Boulevard on Vanowen."

classification has yet been promulgated. Defendant seeks to detract from this analysis by quoting only the first portion of the following excerpt while ignoring the italicized balance: "Obviously, a police officer must have a reason for any contact with a citizen other than a casual greeting. A police officer may not use the authority of his uniform and badge to go around promiscuously bothering citizens. *But as long as his conduct is reasonably consistent with his overall duties of protecting life and property and aiding the public in maintaining lives of relative serenity and tranquillity, his contact is not necessarily a 'detention' in the Henze*[3] *sense."* (*Id.,* at p. 439, italics added.)

Here Officer Robinson's "reason" for wishing to contact those drivers who, to his experienced eye, appear to be "unnormal, [is] . . . to see if there is something wrong." To us such a concern for the public safety represents no utilization of uniform and badge to promiscuously bother citizens.

The order under review is reversed.

Roth, P. J., and Beach, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied August 15, 1984.

---

[3]*People* v. *Henze* (1967) 253 Cal.App.2d 986 [61 Cal.Rptr. 545].