[No. B008849. Second Dist., Div. Two. Dec. 24, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT EARL HOLLOWAY, Defendant and Appellant.

## COUNSEL

Richard D. Marino, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, William R. Weisman and Ernest Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GATES, J.**—Following a "slow plea of guilty" effected by means of a submission upon the transcript of his preliminary hearing (see *In re Mosley* (1970) 1 Cal.3d 913 [83 Cal.Rptr. 809, 464 P.2d 473]), appellant, Robert Earl Holloway, was convicted of possessing cocaine in violation of Health and Safety Code section 11350. He appeals from the ensuing judgment (order granting probation) contending "the cocaine seized from the hand of appellant should have been suppressed as it was a product of an unlawful detention."

At 2:58 a.m. on the morning of May 6, 1984, Officers Lumas and Tucker were on foot patrol in a residential area of Pasadena where "narcotic traffic" regularly takes place. They saw appellant standing with four other males on a grassy area abutting a large apartment complex. Lumas was able to recognize only appellant who was known to frequent the area although he did not reside there.[1]

---

[1]Specifically Officer Lumas testified: "I have made in excess of 30 arrests in that area for possession of dangerous drugs, possession for sales, and other narcotic-related incidents in that general area. I have known a large number of people who frequent that area that are not residents. To be specific, Mr. Holloway who is up there a great deal of the time and several other people I can name who are always there and do not live in that area. [¶] The pattern of narcotic traffic in that area moves from various locations. It's sometimes centered in the Claremont cul-de-sac and has since moved up to the area of 1322 Sunset. When it was in the Claremont cul-de-sac Mr. Holloway was present there on a regular basis. When

Since the five men had their backs turned, the officers' approach went unnoticed until they were almost upon the nocturnal huddle. At that point, one of the men saw them, said something and everyone promptly took flight—except appellant who, it appeared, remained unaware of the officers' presence.[2] Officer Lumas had closed to only three feet when appellant, realizing he was there, manifested surprise. When the officer said, "hold it," rather than complying, appellant, who had been looking down at his open hand, closed it into a fist and moved his arm ". . . as if he were going to throw something." Recognizing that appellant was probably attempting to discard contraband, Officer Lumas stopped appellant's arm and opened his hand when appellant refused to do so, disclosing .18 grams of cocaine in rock form.

It is possible that Officer Lumas' initial pronouncement, "hold it," should not be regarded as having created a true "detention." That is, even had appellant's conduct been that of the most honorable and innocent citizen, Officer Lumas would still have been entitled to seek an interview with him regarding the remarkable behavior of his companions.

■ ". . . 'There can be no doubt that a police officer in the performance of his duties shares the right of all persons to address another on the public streets, or at least that there is no constitutional proscription of his so doing. "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." [Citation.] And so long as his conduct does not constitute a "detention," a police officer may talk to anyone in a public place, "something that any person would lawfully be permitted to do, or try to do." [Citation.] . . .'" (*In re Danny E.* (1981) 121 Cal.App.3d 44, 49 [174 Cal.Rptr. 123].)

Potential ambiguities, of course, will inevitably occur for unless the party with whom the interview is sought remains stationary, at least momentarily, effecting even an initial request for his cooperation, albeit done ever so politely, will prove a most awkward enterprise. (See *People* v. *King* (1977) 72 Cal.App.3d 346, 349 [139 Cal.Rptr. 926].)

■ In any event, if Officer Lumas' mere act of speaking did constitute a form of temporary "custody," under the circumstances it was certainly justified. Though quoted on other occasions, the observations of our former colleague Justice Macklin Fleming bear repeating here: "When circumstances demand immediate investigation by the police, the most useful, most

---

it moved up to Sunset he was again present on the Sunset side on a regular basis."

[2]Officer Tucker vainly pursued the fleeing foursome, an action which appellant presumably also regards as constitutionally impermissible, although here it was not contended that this hasty mass exit was necessary "to avoid [the] persistent harassment" shown to have existed in *People* v. *Aldridge* (1984) 35 Cal.3d 473, 479 [198 Cal.Rptr. 538, 674 P.2d 240].

available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.

"From the point of view of the person detained, temporary detention clearly amounts to some deprivation of his personal freedom of movement. Yet freedom is not absolute, and rights are correlative to duties. The temporary loss of personal mobility which accompanies detention may be deemed part payment of the person's obligation as a citizen to assist law enforcement authorities in the maintenance of public order, an obligation reflected in the operation of such traditional institutions as the sheriff's posse, the hue and cry, etc. (Pen. Code, § 150; Gov. Code, § 26604.) Nor should the deprivation of his freedom of movement be considered all loss by the person detained, for in fulfilling his obligation as a citizen he is also serving his own interests. The person detained has two interests at stake, his specific interest in unrestricted freedom of movement, and his general interest as a member of the community in the preservation of public peace and tranquility. In clearing himself of suspicion and releasing the police for other duties connected with the maintenance of public peace he is broadly serving his general interest as a citizen. Although in times of tranquility he tends to assume that his first interest is paramount and his second one inconsequential, times are not always tranquil, and the persistence of crime and civil disorder serves as a continuing reminder of his substantial and direct interest in public peace, for whose preservation he must at times make some personal sacrifice." (*People* v. *Manis* (1969) 268 Cal.App.2d 653, 665-666 [74 Cal.Rptr. 423].)

The facts which aroused Officer Lumas' suspicions here were both specific and articulable. They suggested that some criminal activity was afoot and that appellant might be involved. In arguing to the contrary, appellant primarily relies on *People* v. *Aldridge, supra,* 35 Cal.3d 473, and *People* v. *Bower* (1979) 24 Cal.3d 638 [156 Cal.Rptr. 856, 597 P.2d 115]. Those cases, however, are readily distinguishable.

In each, the court stressed the fact that there was nothing abnormal about the time or place at which the encounters there under review took place. Thus, *Bower, supra,* 24 Cal.3d 638, expressly pointed out: ". . . the time at which the detention occurred (8:37 p.m.), while falling during darkness in winter, is simply not a late or unusual hour nor one from which any inference of criminality may be drawn." (At p. 645.) With equal emphasis *Aldridge, supra,* 35 Cal.3d 473, declared, ". . . being in the area of a liquor store at 10:15 p.m., possibly carrying alcohol, is neither unusual nor sus-

picious . . . ." (At p. 478.) Three a.m., on the other hand, is both a late and an unusual hour for anyone to be in attendance at an outdoor social gathering, particularly in a residential neighborhood where he does not reside.

Furthermore, the subject grouping occurred in a high crime area, known to be frequented by narcotic traffickers. ■ It is true, unfortunately, that today it may be fairly said that our entire nation is a high crime area where narcotic activity is prevalent. Therefore, such factors, standing alone, are not sufficient to justify interference with an otherwise innocent-appearing citizen. (*People* v. *Aldridge, supra,* 35 Cal.3d at pp. 478-479; *People* v. *Bower, supra,* 24 Cal.3d at p. 645.) ■ Nevertheless, it would be the height of naivete not to recognize that the frequency and intensity of these sorry conditions are greater in certain quarters than in others. Consequently, we must allow those we hire to maintain our peace as well as to apprehend criminals after the fact, to give appropriate consideration to their surroundings and to draw rational inferences therefrom, unless we are prepared to insist that they cease to exercise their senses and their reasoning abilities the moment they venture forth on patrol.

To date, at least, no court has held that the "[m]any citizens of this state [who] are forced to live in areas that have 'high crime' rates or [who] come to these areas to shop, work, play, transact business, or visit relatives or friends" (*People* v. *Bower, supra,* 24 Cal.3d at p. 645) are not constitutionally entitled to have even those dangerous locales rendered as safe and crime-free as is legally permissible. In sum, the time and place where the unprovoked flight of appellant's sleepless companions occurred justified their pursuit by Officer Tucker and rendered Officer Lumas' desire to question appellant entirely reasonable.[3] (*People* v. *Aldridge, supra,* at p. 480, and cases there cited.)

■ Lastly, it should also be emphasized that Officer Lumas' response to appellant's hand motion would not have been wrongful even if appellant

---

[3]The trial court aptly summarized its reasoning in this regard as follows: "I think that, aside from the high narcotics activity or however they want to characterize this, the court is not placing a great deal of reliance on it, I think that the police are acting reasonably in approaching people who are out at 3:00 in the morning by a residential dwelling. [¶] I mean, there's just no—there may be a legitimate reason for being there. I find it hard to believe that there would be, and I think that the police are acting perfectly reasonable in at least going up to the individuals and inquiring as to what their business is at 3:00 in the morning next to a house. [¶] I know if they were next to my house at 3:00 in the morning, I'd want the police to go ask them what they are doing. So I think the police were acting reasonably. [¶] And when the others fled and one individual attempted to discard something, I think he was—I think the officer was acting reasonably in preventing that and he doesn't have to wait until the subject matter is actually discarded. [¶] So based upon that rationale, the 1538.5 will be denied."

could be said to have been inappropriately detained for purpose of questioning. It is well settled that evidence to be suppressed because of a Fourth Amendment violation must in some sense be the product of illegal governmental activity. (*United States* v. *Crews* (1980) 445 U.S. 463, 471 [63 L.Ed.2d 537, 545, 100 S.Ct. 1244].) Indeed, the challenging party must demonstrate "an exploitative nexus" between the challenged evidence and the primary illegality. (*People* v. *Cella* (1983) 139 Cal.App.3d 391, 400 [188 Cal.Rptr. 675].) No such causal connection was shown here.

■ ■■■ The appearance of a police officer, even when unexpected, would not lead an innocent citizen, by whose standards the propriety of all official conduct is to be measured[4] (*People* v. *Bellomo* (1984) 157 Cal.App.3d 193, 198 [203 Cal.Rptr. 610]), to attempt to hurl his personal property into the night. ■ It is only when a person has reasonable cause to believe his private possessions will inevitably be exposed to view by improper police practices, that their attempted abandonment will be deemed the fruit of that conduct.

We do not regard *People* v. *Menifee* (1979) 100 Cal.App.3d 235 [160 Cal.Rptr. 682], as standing for a contrary rule. Although not recited in the opinion itself, presumably the police officer there involved had been guilty of illegal conduct during his previous encounters with the suspect, otherwise the latter's reported behavior, and the trial court's factual finding with regard thereto, would have been inexplicable. (See *People* v. *Patrick* (1982) 135 Cal.App.3d 290, 292 [185 Cal.Rptr. 325].)

There is nothing in the present record to suggest that appellant did, or could have, entertained a rational belief he had been threatened with either an arrest or a search of his person, prior to his attempt to dispose of the cocaine he had the misfortune to be holding when the police chanced upon

---

[4]"It should always be borne in mind that the constitutional proscription against unreasonable [detention], and the judicial rules promulgated in support thereof, are designed to protect the innocent citizen, not the criminal. It is true, of course, that only the guilty profit *directly* from the exclusionary rule. However, it is assumed that over the long run the law abiding members of society will benefit from that curtailment of excessive police conduct that it is hoped will result from the application of such rule. In essence, the criminal is but an unavoidable 'third party beneficiary' of the compact effected between the governed and their government. [¶] As a consequence, given a situation supplying probable cause to believe [someone's condition should be investigated], one measure to be utilized in fixing the parameters of permissible police conduct designed to resolve the question is to be found in the determination of the amount of fear, physical trauma, embarrassment, indignity, etc., to which an innocent person would necessarily be subjected before his innocence could be clarified.[2] . . ." (Italics in original.) Footnote 2 reads as follows: "The 'need for swift action' and the 'seriousness of the offense' involved are also 'highly determinative factor[s] in any evaluation of police conduct. . . .' (*People* v. *Johnson* (1971) 15 Cal.App.3d 936, 940-941 . . . .)" (*People* v. *Lara* (1980) 108 Cal.App.3d 237, 241 [166 Cal.Rptr. 475].)

him. Rather, it was solely his own awareness of the illicit nature of his activities that precipitated his efforts to destroy the proofs thereof.

The judgment (order granting probation) is affirmed.

Compton, Acting P. J., and Beach, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 13, 1986.