[No. G020544. Fourth Dist., Div. Three. May 27, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT FRANCIS FORANYIC, Defendant and Appellant.

**COUNSEL**

Alisa A. Shorago, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BEDSWORTH, J.**—Having pled guilty to possession of methamphetamine, Robert Francis Foranyic contends the court erroneously denied his motion to suppress evidence against him. ■ He argues there were not suspicious circumstances justifying his detention, and that the methamphetamine subsequently found on his person should have been suppressed. Thus are we called upon to decide whether police may detain a man with an ax riding a bicycle at 3 a.m.

A Huntington Beach patrolman approached Robert Francis Foranyic when he saw him standing astride his bicycle, to which was attached a large ax, at 3 in the morning. The officer ordered him to dismount, explaining that he "wanted to put some distance between him and the ax." Foranyic had difficulty following this direction and showed classic symptoms of intoxication. In fact, the officer found him to be highly intoxicated (Foranyic was reasonably sure he was either in Long Beach or Bakersfield, but unable to narrow it down more than that, and he could hardly stand without the support of his bicycle). Another officer evaluated Foranyic's symptoms and arrested him for a violation of Penal Code section 647, subdivision (f). During booking, methamphetamine was found in a baggie taped to Foranyic's belt.

We have no doubt Foranyic was detained when he complied with the officer's direction that he step away from his bicycle. While the officer was certainly free to approach Foranyic and speak to him, once he ordered him to lay down his bike and step away from it, he clearly conveyed the impression Foranyic was not free to leave. (*Michigan* v. *Chesternut* (1988) 486 U.S. 567, 573 [108 S.Ct. 1975, 100 L.Ed.2d 565]; *In re James D.* (1987) 43 Cal.3d 903, 912-913 [239 Cal.Rptr. 663, 741 P.2d 161]; *People* v. *Lopez* (1989) 212 Cal.App.3d 289, 292 [260 Cal.Rptr. 641].) Once Foranyic submitted to this show of authority, the detention was complete. (*California* v. *Hodari D.* (1991) 499 U.S. 621 [111 S.Ct. 1547, 113 L.Ed.2d 690].)

And, to our minds, it was perfectly appropriate. ■ The touchstone of analyzing a detention, or for that matter any Fourth Amendment issue, is reasonableness. "The guiding principle, as in all issues arising under the Fourth Amendment and under the California Constitution [citations], is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' (*Terry* v. *Ohio* [(1968) 392 U.S. 1, 19 [88 S.Ct. 1868, 1878-1879, 20 L.Ed.2d 889]].)" (*In re Tony C.* (1978) 21 Cal.3d 888, 892 [148 Cal.Rptr. 366, 582 P.2d 957].)

It is particularly important to bear this in mind with regard to detentions, since the concept of "reasonable suspicion," which governs them, does not

lend itself to ready definition. Our approach is perhaps best described by the United States Supreme Court in *United States* v. *Sokolow* (1989) 490 U.S. 1, 7-8 [109 S.Ct. 1581, 1585-1586, 104 L.Ed.2d 1]: "The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.' ([*Illinois* v.] *Gates* [(1983) 462 U.S. 213,] 232 [103 S.Ct. 2317, 2329, 76 L.Ed.2d 527].) We think the Court of Appeals' effort to refine and elaborate the requirements of 'reasonable suspicion' in this case creates unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment. In evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances—the whole picture.' [*United States* v. *Cortez* (1981) 449 U.S. 411, 417 [101 S.Ct. 690, 695, 66 L.Ed.2d 621].] As we said in *Cortez*: [¶] 'The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers.' (*Id.*, at 418.)" (*Ibid.*)

■ And so are we. We conclude that a reasonable police officer, considering the totality of the circumstances, would reasonably suspect criminal activity might be afoot upon viewing someone on a bicycle, with an ax, at 3 in the morning. Certainly we would expect a diligent officer to investigate such unusual behavior through the relatively unintrusive means of a detention. This is so even though no recent "ax crime" had been reported.

For while Foranyic insists there was nothing about him which suggested *criminal* activity, he is unable to suggest, and we cannot conceive of, much in the way of *noncriminal* activity which is accomplished with an ax in the dead of night. The officer could reasonably eliminate firefighting and lumberjacking from the list of possible pursuits Foranyic might have been engaged in. And while there are doubtless some reasonable explanations which might be conjured up, "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct." (*In re Tony C., supra,* 21 Cal.3d at p. 894.)

As Foranyic points out, not all unusual activity will support a detention. He is correct that *People* v. *Henze* (1967) 253 Cal.App.2d 986 [61 Cal.Rptr. 545] disapproved of a detention with the explanation that, "Although we find sufficient indications in this case that the defendants were engaged in some unusual activity, we do not find sufficient suggestion in the record that their unusual activity was related to crime." (*Id.* at p. 988.) But that court went on to limit its holding to the specific facts before it in terms highly relevant to

our analysis, explaining that, "if this incident had taken place during the hours of darkness, its timing alone would have provided a sufficient extra factor to justify temporary detention for investigation." (*Id.* at p. 989.)

This incident did take place during the hours of darkness. Stygian darkness. No one who has ever worked a graveyard shift can underestimate the significance of *any* bicycle traffic at that hour, much less lethally armed bicycle traffic. In *People* v. *Holloway* (1985) 176 Cal.App.3d 150,155 [221 Cal.Rptr. 394], the court upheld a detention based upon the defendant's presence in a high-crime area with four other men. While acknowledging the defendant's right to be in such an area conversing with acquaintances, the court explained, "Three a.m., on the other hand, is both a late and an unusual hour for anyone to be in attendance at an outdoor social gathering, particularly in a residential neighborhood where he does not reside." (*Id.* at p. 155.) We consider it equally unusual to be abroad at that hour on any errand that requires an ax.

But the point is not that less is required to support a detention at 3 a.m., than would be required for the same action at 3 p.m. That is true (see *People* v. *Souza* (1994) 9 Cal.4th 224, 241 [36 Cal.Rptr.2d 569, 885 P.2d 982]), but the more cogent point is that there is some activity which is so unusual, so far removed from everyday experience that it cries out for investigation. Such activity will justify a detention even when there is no specific crime to which it seems to relate.

We view this as such conduct. While it is true that there are many legitimate uses for an ax, they are generally daylight activities. A consensus seems to have developed that recognizes the inadvisability of wielding an ax in darkness.

Nor can we ignore the long history of the ax as a weapon. While no one refers to a "gun-murderer" or "knife-murderer" or "crowbar-murderer," the equivalent usage with regard to an ax is well ensconced in American usage. The ax, like the machete and the straight razor, is an implement whose unfortunate utility as a weapon sometimes overshadows its value as a tool.

Thus, while it is true no "ax crime" had been reported, and while it is true the officer was not asked what specific crime he might have thought he was investigating when he ordered Foranyic to dismount, it was nonetheless reasonable, logical and legal for the officer to require Foranyic to spend a few minutes explaining himself and these circumstances, which were not

only unusual, but unique in the annals of reported California decisions. Some things cannot be ignored. The judgment is affirmed.

Sills, P. J., and Wallin, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 26, 1998.