[No. H005565. Sixth Dist. Mar. 8, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY HUERTA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III and IV.

COUNSEL

Garcia and Schnayerson and Jesse J. Garcia for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Martin S. Kaye and Jeremy Friedlander, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

COTTLE, J.—Defendant Larry Huerta was charged by information with possession of methamphetamine for sale (Health & Saf. Code, § 11378). After his motions to dismiss and to suppress evidence (Pen. Code, §§ 995, 1538.5) were denied in superior court, defendant pleaded guilty to the charge. He was placed on probation for three years upon condition, inter alia, that he serve six months in county jail. On appeal, defendant contends (1) the trial court erred in denying his motion to suppress evidence and (2) the magistrate erred in denying his motion for a continuance.

I

At approximately 8:30 p.m. on November 11, 1987, several police officers served a search warrant at 146 Martha Street in San Jose. They found approximately a pound of methamphetamine, a pound of cocaine, numerous weapons, and packaging materials commonly used in the sale of narcotics. All of the persons present at the residence were arrested.

At least two hours later, while the police were still inside the residence, defendant opened the front door "without knocking or making any announcement" and walked inside. Concerned defendant might live there and be part of a conspiracy to sell narcotics out of that residence, Officer Wall asked defendant if he lived there. Defendant replied, "No, I don't." Wall then asked defendant to identify himself, to produce some identification, and to explain his purpose for being at the residence. Defendant "acted very nervous and didn't have a reason" but gave his name, indicated he had identification in his wallet, and reached to pull his wallet out of his pants. Wall told him to wait, patted the area, determined the object defendant was reaching for appeared to be a wallet, and permitted defendant to remove the wallet and retrieve some identification.

Not totally satisfied as to who defendant was by the identification he produced and concerned he might be armed, Wall pat-searched defendant for weapons. He felt a large bulge that fit in the palm of his hand in defendant's left breast pocket which Wall thought was "a small caliber weapon wrapped in a handkerchief." Keeping his hand on the object, Wall asked defendant what it was. Defendant said it was money, but Wall did not believe him because the object felt too large and too firm to be money. Wall retrieved the object, which in fact turned out to be $3,100 in United States currency, rolled up with rubber bands around it. The discovery of that large amount of money coupled with defendant's nervous behavior and unannounced entry into the residence led Wall to suspect "there was a good chance" defendant was there as a narcotics purchaser "[a]nd/or supplier" but he felt he did not have sufficient facts to arrest defendant for involvement in the drug operation at the residence.

Upon request for further identification, defendant provided an address and phone number; Wall called the number to verify the information while defendant was detained by another officer. The person who answered the phone identified himself as a relative of defendant's, said defendant did not live there, and provided Wall with a number and address where defendant did live. When Wall called that number, he reached an answering machine with a recording from "Larry." Suspecting defendant was trying to hide something such as a warrant for his arrest, Wall called the police station to run a check on defendant's identity. As "there was more than one Huerta in the system," Wall was unable to verify defendant's identity or determine if a warrant was outstanding for his arrest. These calls took between 10 and 15 minutes to complete.

Wall next explained to defendant that he was concerned as to defendant's reason for being at the residence and for carrying such a large amount of money. Wall told defendant it would expedite matters if he were truthful, asking why defendant was there, who he really was, if he had any other identification from which Wall could corroborate his identity, and if he had "any priors and any case history." Defendant ultimately provided an address and phone number that matched that provided by his relative, indicated he had some identification in his vehicle, and said he had never been arrested and had no tickets. Wall asked for permission to search defendant's pickup truck which was parked outside; he testified he made the request because he "was not satisfied as to [defendant's] identity, and [defendant] related to me that he had further identification inside his vehicle." Wall also testified that "I explained to him what I was searching for. And he stated that he didn't have anything having to do with narcotics in his vehicle, and to go ahead and proceed."

Officer Salerno assisted Wall in the five-to-ten minute search of the truck. Salerno testified he was "[s]earching for any evidence indicating possession of any illegal drugs" and for "verification of identification." Inside the truck the police found $4,550 in United States currency in an unlocked and open attache case on the passenger seat.[1] There were credit cards and construction papers in the case with defendant's name on them. When Wall "confronted" defendant with the money and papers, defendant said, "'Yeah, that's my money, and that's money that I need for work, and that's all legitimate money.'" Although Wall felt the additional discovery of money in the truck suggested a greater likelihood defendant was involved in narcotics trafficking either as a purchaser or seller, he also felt there was a possibility that defendant's work in construction might lead him to carry that amount of cash.

Officers Wall, Salerno, and other officers spent the next 10 to 15 minutes discussing how their investigation of defendant should proceed. They agreed they had insufficient evidence to justify an arrest or a search warrant for defendant's residence; instead, they decided to ask defendant if he would consent to a search of his residence.

Officer Ferla told defendant he wanted to search defendant's residence, that he had a consent to search form he wanted defendant to sign. Ferla read the form to defendant. Defendant then asked to read it himself, so Ferla gave it to him. Defendant read it, asked no questions, and signed it. Salerno drove defendant and Ferla to defendant's residence at 6269 Royal Oak Court. Wall estimated it was "approximately an hour to possibly longer" from the time defendant first entered the Martha Street residence until he left accompanied by the two officers. Wall never saw defendant handcuffed; he testified it would have been police practice to handcuff him before placing him in a police vehicle had he been arrested, but at that point, he was just detained. Salerno did not recall defendant being handcuffed in the police car although defendant sat in the rear and Salerno did not think he would have placed defendant behind him without handcuffing him.

Ferla testified defendant was not given *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) warnings on the drive to his residence.

Inside defendant's residence, the police located methamphetamine, cash, drug paraphernalia, records of what appeared to be drug transactions, and weapons, including an Uzi semiautomatic rifle.

---

[1] Wall testified to this figure twice immediately after refreshing his recollection from his police report. However, later, during cross-examination, when defense counsel asked Wall, "Now, and parenthetically, also you found in that attache case, you found four hundred and fifty dollars?," Wall answered, "Yes."

## II

Defendant contends his consent to search his truck and residence was the product of an unlawful detention.

The People correctly concede defendant was detained; his freedom was restrained to the point where he was not free to leave. (*United States* v. *Mendenhall* (1980) 446 U.S. 544 [64 L.Ed.2d 497, 100 S.Ct. 1870]; *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777 [195 Cal.Rptr. 671, 670 P.2d 325]. ▇ We conclude the detention was justified under the rule of *Michigan* v. *Summers* (1981) 452 U.S. 692, 702-703 [69 L.Ed.2d 340, 349-350, 101 S.Ct. 2587], which permits law enforcement officers to detain the occupants of a premises while executing a search warrant. When defendant entered the residence without knocking or announcing his presence the officers executing the warrant had reason to believe defendant was directly connected to the premises in some way. His unannounced entry into the residence established his direct association with the premises and gave defendant the status of "occupant" under the rule set forth in *Michigan* v. *Summers*; "[t]he connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." (*Id.*, at pp. 703-704 [69 L.Ed.2d at p. 350]; see also pp. 695-696 [69 L.Ed.2d at p. 345], fn. 4.) "Although the *Summers* Court did not define the duration of permissible detention, it apparently contemplated that occupants could be detained long enough for police to complete extensive searches. See *Daniel,* 808 F.2d at 1405." (*U.S.* v. *Rowe* (N.D.Cal. 1988) 694 F.Supp. 1420, 1424.) In the instant case, Officer Wall was in the process of searching the front room when defendant walked through the front door into that room. Sergeant Hosmer also was still engaged in searching the premises when defendant arrived. Officer Ferla was assigned to search the rear storage area, yard, rear bedroom and closet. He was in the process of conducting his search while defendant was in the living room and saw defendant at least once as he went from one of his assigned tasks to the next. According to Officer Salerno, while defendant was present, some of the other occupants of the premises "were assisting the officers in searching, telling them to look in search areas. That sort of thing." At the time defendant was detained in the dining room, there were at least six officers still present at the Martha Street address. The officers were in control of the location and "the other defendants were being brought in and out of the [dining] room and from one room to another room and assisting identification of items of property." Officer Wall testified that during the time he was talking with defendant in the dining room, Sergeants Marcotte, Oliver, Hosmer, and Officers Ferla and Salerno still "had other assignments or duties to perform." In sum, the record provides no indication that the officers at the premises had completed their search for

contraband before defendant consented to a search of his personal residence and left the premises being searched pursuant to the warrant to assist officers with the subsequent consent search.

While the officers had the right to detain defendant until they completed their search of the premises under *Michigan* v. *Summers,* the initial detention was also valid under a more traditional probable cause analysis. The police had secured a house in which they had found a large quantity of drugs. Defendant then opened the front door and walked inside without knocking or otherwise announcing himself. Although defendant told Officer Wall he did not live there, the police could reasonably conclude defendant was lying or was in some way linked to the drugs and weapons found at the house. They had a reasonable suspicion to believe he had committed or was about to commit a crime. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 22, 30 [20 L.Ed.2d 889, 906-907, 911, 88 S.Ct. 1868]; *In re Tony C.* (1978) 21 Cal.3d 888, 895 [148 Cal.Rptr. 366, 582 P.2d 957].)

■ The police also were justified in pat-searching defendant for weapons. It was reasonable to believe a person entering a residence of illicit drug activity might be armed. "[W]here police officers are called upon to execute a warranted search for narcotics within a private residence they have the lawful right to conduct a limited *Terry* pat-down search for weapons upon the occupants present while the search is in progress." (*People* v. *Thurman* (1989) 209 Cal.App.3d 817, 824 [257 Cal.Rptr. 517].)

■ We next address whether the detention was too long in duration to be justified as an investigative stop by assessing "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. [Citations.]" *United States* v. *Sharpe* (1985) 470 U.S. 675, 686 [84 L.Ed.2d 605, 616, 105 S.Ct. 1568]; see also *People* v. *Dasilva* (1989) 207 Cal.App.3d 43 [254 Cal.Rptr. 563].)

A review of the record establishes that the police acted quickly and diligently to determine who defendant was and, in particular, whether he was linked to the drug activity at the premises being searched. Officer Wall asked defendant for identification. Wall telephoned the number defendant provided as his home number only to discover defendant did not live there. Once defendant had provided false information which needed to be checked further, the officers had reason to extend the detention. (See 3 LaFave, Search & Seizure (2d ed. 1987) § 9.2, subd. (f), p. 382.) They called the police department for an identification check. The information they received was inconclusive. Shortly thereafter, defendant was asked for permission to search his truck for further identification; the five to ten minutes it

took to search the truck was time diligently spent in an attempt to confirm or dispel the officers' reasonable suspicions regarding defendant's association with the established criminal activity at the premises.

It was similarly appropriate to detain defendant during the 10-to-15 minute period after the search of the truck during which several of the officers at the scene met to assess the status of their investigation of defendant. The officers "were having to make decisions. We had a lot of things going on." Officer Wall quickly briefed the others as to what had transpired between him and the defendant, and then the officers voiced their "opinions as to what his association and involvement were, in our opinions, were with the residence . . . that we were at." It was during that briefing that the officers reached a consensus that they did not have sufficient cause to arrest defendant or to search his house without consent. Immediately after that decision was made, they decided to ask defendant for consent to search his residence, to which defendant agreed. However, had defendant refused consent, the detention legitimately could have been extended a few minutes longer in order for Officer Wall to "call up a sergeant or a district attorney at night and run[ ] the whole synopsis by them" since Wall was still considering the prospect of a search warrant "because . . . I don't know all the possibilities involved. And the District Attorney always has another light that can be shed on it."

"There is no rigid time limitation imposed on a detention. The court must determine the purpose of the stop as well as the time reasonably needed to effectuate the purpose. [Citation.]" (*People* v. *Dasilva, supra*, 207 Cal.App.3d at p. 50.) Here, the detention was not unduly prolonged. When an individual who walks unannounced into a premises where a search warrant is being executed and where narcotics already have been seized provides information regarding his identity and residence some of which proves false, appears nervous, provides no explanation for his presence, and is carrying several thousand dollars in cash, a reasonable officer will detain such individual to determine whether he is associated with the known criminal narcotic activity at that location. Officer Wall reasonably asked to search defendant's truck for further identification in an effort to determine defendant's true identity and connection with premises being searched. During the detention, the officer sought identification, telephoned the number defendant provided and in turn the number provided by defendant's relatives, telephoned inquiries concerning defendant's identification and criminal background, sought and obtained consent to search for further identification in defendant's truck, and met with other officers at the scene to determine what course of action was most appropriate in light of the status of the investigation to that point. Throughout the detention, the

police diligently pursued a means of investigation likely to confirm or dispel their reasonable suspicions.

III, IV*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

V

The judgment is affirmed.

Capaccioli, Acting P. J., and Bamattre-Manoukian, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 7, 1990. Mosk, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 744.