[No. E007636. Fourth Dist., Div. Two. Nov. 15, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM CHANDLER GALLANT, Defendant and Appellant.

**COUNSEL**

Gary W. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Janelle B. Davis, and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HOLLENHORST, Acting P. J.**—Defendant pleaded guilty to one count of possession of methamphetamine for sale (Health & Saf. Code, § 11378), after his motion to suppress evidence (Pen. Code, § 1538.5) was denied. Defendant appeals from the resulting conviction, on the ground that the trial court had erred in denying his motion. (*Id.*, subd. (m).) Concluding that the detention and search of defendant had been unreasonable, we reverse.

### THE FACTS

Early on a September evening, five police officers were executing a search warrant at a single-family residence in Riverside. The warrant authorized the officers to search Joyce Gardner and her residence for methamphetamine. There were no male subjects in the warrant. The police knew that Gardner's common law husband had recently died, and that she lived with her mother.

No one was present when the police first arrived at the residence. Ms. Gardner and her mother arrived sometime thereafter, and were arrested and handcuffed. In searching the house, the police found several baggies of what appeared to be methamphetamine, but no weapons.

About 30 to 40 minutes after Gardner had arrived at the house, and after the suspected contraband had been discovered there, defendant arrived. He was driving an El Camino truck behind which he was pulling a boat, both of which he parked at the curb in front of the residence. Up to this point, the police did not observe any weapons or anything else about defendant which suggested criminality.

From a window, the police observed defendant get out of the vehicle, walk up to the front of the house, and knock on the front door. There was nothing in the manner of defendant's approach to the door which made the police suspect him of any criminal conduct.

One of the police officers answered defendant's knock at the door by drawing his gun, opening the door, and confronting defendant. Before defendant said anything, the officer identified himself, explained that they were searching the residence, advised defendant that "he would be detained shortly to determine his involvement at the residence," and ordered him to step inside the house. He was not free to refuse.

Immediately after he was inside the house, defendant was told to put his hands on top of his head, while one of the police officers conducted a patdown search of defendant. During the course of that search, the officer located and removed a knife, either from defendant's pocket or from a sheath on his hip. Defendant was then told that he could lower his hands, and the officer returned his gun to its holster. However, defendant was not yet free to leave.

While the patdown was occurring, or immediately thereafter, another officer began questioning defendant to determine his involvement with the residence. Defendant identified himself, and said that he had come there to see Ms. Gardner. At that point in time, he was free to leave, but no one told him so.

Within 10 to 15 seconds of finding out who he was, the second officer told defendant that people who come to a house at which police are executing a search warrant and have found controlled substances are generally there to buy or sell controlled substances, and asked defendant if he would permit the officer to search his person and his vehicle for controlled substances. (While he initially testified that the request to search the vehicle had not been made until after the search of defendant's person had been requested, consented to, and performed, the officer later corrected his testimony to conform to his testimony at the preliminary hearing, which was that both requests had been made simultaneously.) Defendant indicated his consent to the searches. No one advised defendant that he could refuse to consent.

In searching defendant's person, the police found cash in the sum of $3,000, but nothing else which led the police to believe that defendant was engaged in criminal conduct. Less than three minutes elapsed from the time that defendant entered the residence to the time that the police seized the $3,000.

In searching the vehicle and boat, the police found a plastic bag containing what appeared to be a half pound or more of methamphetamine, as well as other controlled substances and drug paraphernalia. Prior to the search being completed, defendant revoked his consent to any further search of his

vehicle or boat. At that time, the search was discontinued, and defendant was placed under arrest.

At the hearing on the motion to suppress evidence derived from the allegedly unreasonable search, the police testified that whenever a person approaches a house at which the police are executing a search warrant for drugs, their "standard operating procedure" is to confront that individual at gunpoint and to detain him or her, during which detention they pat down the individual for weapons, and question him or her to determine whether he or she may be involved in the suspected criminal activity which is the subject of the search warrant. The reasons for this practice are that "any time you deal in narcotics, there's numerous guns involved," that the person approaching the house is often armed, and that in their experience the person is frequently coming to the house to either purchase or deliver narcotics.

Consistent with this standard procedure, the police testified that defendant "was being detained until we made sure that he was not involved in anything that had to do with the house." They acknowledged that they did not suspect that he might be involved in some criminal activity until they subsequently located the large sum of money in his pocket, and that they had no objective evidence of any criminal activity by defendant prior to searching his vehicle.

In denying the motion to suppress, the trial court noted the police officer's subjective belief that persons approaching a house at which a search warrant for narcotics is being executed, are going there to buy or sell narcotics. The court found that, when narcotics have already been discovered at the house, that belief is objectively reasonable. Under those circumstances, it found that a detention of such a person to ascertain his possible connection to the house being searched is lawful. It concluded that since the consent for the search was not the product of an unlawful detention, the motion should be denied.

## ISSUES

In determining whether the trial court correctly denied defendant's motion to suppress the evidence discovered in the searches of his person and vehicle, we must answer three questions: (1) Was defendant detained? (2) If so, was that detention reasonable? (3) If not, were the searches justified by defendant's subsequent consent?

## DISCUSSION

### A. STANDARD OF REVIEW

 In presiding over the hearing on a motion under Penal Code section 1538.5, the trial court is sitting as a finder of fact. Accordingly, on review, the trial court's factual findings, "whether express or implied, must be upheld if they are supported by substantial evidence." (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) However, since the reasonableness of the search is an issue of law, an appellate court conducts an independent review of the trial court's conclusion. In the event of appeal, "it becomes the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness." (*Ibid.*; *People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].) Should the search or seizure fall short of that standard, as represented by the Fourth Amendment of the federal Constitution, then the evidence seized as a result of that search will be excluded. (*Mapp* v. *Ohio* (1961) 367 U.S. 643, 655 [6 L.Ed.2d 1081, 1089-1090, 81 S.Ct. 1684, 84 A.L.R.2d 933].)[1]

### B. WAS DEFENDANT DETAINED?

Detentions are to be distinguished from consensual encounters and arrests. "For purposes of Fourth Amendment analysis, there are basically three different categories or levels of police 'contacts' or 'interactions' with individuals, ranging from the least to the most intrusive. First, there are . . . 'consensual encounters' [citation], which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever—i.e., no 'seizure,' however minimal—and which may properly be initiated by police officers even if they lack any 'objective justification.' [Citation.] Second, there are what are commonly termed 'detentions,' seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police 'if there is an articulable suspicion that a person has committed or is about to commit a crime.' [Citation.] Third, and finally, there are those seizures of an individual which exceed the permissible limits of a detention, seizures which include formal arrests and restraints on an individual's liberty which are comparable to an arrest, and which are constitutionally permissible only if the police have probable cause

---

[1] While a search which is unreasonable as measured by article I, section 13, of the California Constitution is unlawful (*In re Lance W.* (1985) 37 Cal.3d 873, 886 [210 Cal.Rptr. 631, 694 P.2d 744]), the exclusion of the evidence obtained from such a search is a remedy which is no longer available unless the search also violates the federal Constitution (*id.* at p. 887). Thus, "questions about exclusion of evidence must be resolved under federal, and not state law." (*In re James D.* (1987) 43 Cal.3d 903, 911 [239 Cal.Rptr. 663, 741 P.2d 161].)

to arrest the individual for a crime. [Citation.]" (*Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, 784 [195 Cal.Rptr. 671, 670 P.2d 325], citing *Florida* v. *Royer* (1983) 460 U.S. 491 [75 L.Ed.2d 229, 103 S.Ct. 1319] (plur. opn.).)

■ The police have detained an individual " 'if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' [Citation.]" (*Michigan* v. *Chesternut* (1988) 486 U.S. 567, 573 [100 L.Ed.2d 565, 572, 108 S.Ct. 1975].) Those circumstances may include "physical restraint, threat of force, or assertion of authority . . . ." (*In re Tony C.* (1978) 21 Cal.3d 888, 895 [148 Cal.Rptr. 366, 582 P.2d 957].)

Using this standard, it is clear that defendant was detained. The trial court expressly found that defendant was not free to leave, and that a detention had occurred. This finding is amply supported by the evidence that defendant was ordered into the house at gunpoint, that a patdown search for weapons was conducted, and that the officers themselves did not consider him to be free to leave.

## C. WAS THE DETENTION UNLAWFUL?

■ The lawfulness of a detention is not measured by the same standard as an arrest. "It is settled that circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation." (*In re Tony C., supra,* 21 Cal.3d at p. 892, citing *Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906-907, 88 S.Ct. 1868].) However, the police are not free to detain citizens at will. " '[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity, and the same involvement by the person in question. The corollary to this rule, of course, is that any investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. (*Terry* v. *Ohio, supra,* 392 U.S. at p. 22 [20 L.Ed.2d at pp. 906-907].)' " (*In re James D., supra,* 43 Cal.3d at p. 914, quoting from *In re Tony C., supra,* at p. 893, fn. omitted.)

Here, the facts known or apparent to the police prior to their detention and search of defendant do not satisfy this test. While they reasonably

suspected criminal activity at the residence, based upon the discovery of methamphetamine within it, there were no "specific and articulable facts" which could justify the suspicion that defendant was involved in that activity.

There were no males named in the search warrant. To the officers' knowledge, there were no adult male occupants of the house. Certainly, defendant was not in the house when the police arrived. The officers were not familiar with defendant. There was nothing in his appearance or the manner of his approach to the house to make them suspect him of criminal activity. Other than knocking at the door, he said nothing to anyone prior to being ordered inside the house. The police admitted that they did not suspect him of criminal activity until they found the $3,000 on his person. In short, there were no facts connecting defendant to the premises or to the criminal activity which they suspected of being conducted at the premises.

The People appear to argue that the officers' prior experience that "subjects who show up in this type of situation [i.e., at a house at which a search is being conducted and at which methamphetamine has been found] usually have methamphetamine on them or are there to purchase the drug" is a fact which justifies their detention of defendant.

We cannot agree. The law does not permit a person to be detained unless the police have articulable facts making it objectively reasonable to suspect that particular person of criminal activity. From the fact that drugs in a saleable quantity have been found in a house, police may reasonably assume that *some* people come to that house to either deliver or buy drugs. However, a police officer may *not* reasonably conclude from that same fact that *everyone* approaching that house is involved in the drug trade. In the absence of evidence of their particular involvement in the illegal activity, friends, family, and the Fuller Brush man should be free to knock on the door without being ordered inside at gunpoint and frisked.

The only authority cited by the People in support of their contention, *Michigan* v. *Summers* (1981) 452 U.S. 692 [69 L.Ed.2d 340, 101 S.Ct. 2587], is factually dissimilar. There, in approaching a residence to execute a warrant for the search of that residence, the police observed one of the occupants walking out of the front door. "When defendant was asked to open the door he replied that he could not because he left his keys inside," thus confirming that he was an occupant. He was not detained until his status as an occupant had been thus determined. (*Id*. at p. 693, fn. 1 [69 L.Ed.2d at p. 344, fn. 1].) Here, on the other hand, defendant was not an occupant, as demonstrated to the officers when he knocked on the door

instead of opening it himself. Furthermore, the officers knew that the male member of the household had recently died.

The detainee's status as an occupant was critical to the Supreme Court's reasoning in upholding the detention in *Summers*. "Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband. A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there." (452 U.S. at p. 701 [69 L.Ed.2d at p. 349].) "Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant." (*Id*. at pp. 703-704, fn. omitted [69 L.Ed.2d at p. 350].) "Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (*Id*. at p. 705, fn. omitted [69 L.Ed.2d at p. 351].)

The People suggest that the same rule should apply to the detention of visitors not present when the search warrant is executed. They argue that since "the police did not know if appellant was an occupant or not," they should be permitted to detain him until they discover the answer to that question.

The law is to the contrary. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." (*Florida* v. *Royer, supra*, 460 U.S. at p. 497 [75 L.Ed.2d at p. 236]; *Wilson* v. *Superior Court, supra*, 34 Cal.3d at p. 789.) For instance, the police may ask the individual for his name and address. (*People* v. *Lopez* (1989) 212 Cal.App.3d 289 [260 Cal.Rptr. 641]; *People* v. *Ross* (1990) 217 Cal.App.3d 879, 885 [265 Cal.Rptr. 921].) "The person approached, however, need not answer . . . at all and may go on his way. [Citations.] *He may not be detained even momentarily without reasonable, objective grounds for doing so . . . .*" (*Royer, supra*, at pp. 497-498, italics added; *Wilson, supra*, at p. 789.)

Thus, while the police are free to question a visitor, such as defendant, to ascertain his connection to the premises, they cannot detain him to do so unless they have specific, articulable facts indicating such a connection. The mere hunch that he might be an occupant of the house which they are searching, or a policy to search everyone who approaches, is not such a specific fact.

The People next argue that "after the police discovered narcotics at the residence . . . it truly became a 'high crime area' and immediately cast a reasonable suspicion of possible criminal activity to anyone who came calling," citing *In re Frederick B.* (1987) 192 Cal.App.3d 79 [237 Cal.Rptr. 338] and *People v. Holloway* (1985) 176 Cal.App.3d 150 [221 Cal.Rptr. 394].

■ Once again, we disagree. We question whether a single residence is immediately transformed into a "high crime area" by the one-time discovery of several baggies of methamphetamine. Moreover, whatever history of illicit activity is necessary for a place to earn the reputation for a high level of crime, and whatever the geographical extent of such an area, it is settled that the presence of a person in such an area, by itself, is "not sufficient to justify interference with an otherwise innocent-appearing citizen." (*People v. Holloway, supra,* 176 Cal.App.3d at p. 155.) That a person chooses to "visit relatives or friends" who reside in a high-crime area does not justify police in viewing that visit with suspicion. (*People v. Bower* (1979) 24 Cal.3d 638, 645 [156 Cal.Rptr. 856, 597 P.2d 115].)

In short, the existence of a high-crime area may be a factor to consider, but it cannot be the sole factor. Here, the police testified that there was nothing suspicious about the manner in which defendant approached the front door. That the front door may have been the gateway into an undefined "high crime area" cannot, by itself, justify his detention.

In summary, far from demonstrating specific, articulable facts that support a reasonable suspicion connecting defendant to the illegal activity occurring in the searched premises (or to some other, unidentified illegal activity on the part of defendant), this record supports only one conclusion: that the detention here was predicated on nothing more than a hunch, or unfounded suspicion, and a policy that anyone who came to a residence during a search was automatically going to be detained and questioned to eliminate the possibility that the person was involved in the criminal activity in the house. That hunch and that policy were insufficient to justify

defendant's detention. Therefore, that detention violated defendant's constitutional rights to be free from unreasonable searches and seizures.[2]

### D. WERE THE SEARCHES CONSENSUAL?

■ The People argue that the searches of defendant's person and vehicle were based on his consent, and thus were valid independently of the validity of the detention. We cannot agree.

In *People* v. *Lawler, supra,* "the officer's request [to search the suspect's belongings] and defendant's assent immediately followed the illegal pat-down search; neither any time nor event intervened." (*Id.,* 9 Cal.3d at p. 164.) For that reason, the court concluded "that the consent and the prior illegal search are inextricably joined; that the consent, being itself the fruit of an illegal assertion of authority, cannot justify a further illegal search." (*Ibid.*)

The same is true here. Defendant was ordered inside the house at gunpoint, patted down for weapons, interrogated regarding his identity, asked for consent to a search of his person and vehicle, and personally searched a second time, all within less than three minutes. Under these circumstances, the consent cannot be segregated from the illegal assertion of authority.

### CONCLUSION

Since the initial detention was illegal, the evidence seized thereafter must be excluded unless there was an intervening, independent consent by defendant. Since the consent given here was the product of, rather than independent from, the illegal detention, the evidence should have been excluded.

### DISPOSITION

The judgment is reversed and the cause is remanded to the superior court. The trial court is instructed to vacate its order denying defendant's motion to suppress, and to enter a new order granting that motion. The court is further instructed to vacate defendant's guilty plea and reenter his not guilty plea, if defendant so requests within 30 days after the issuance of

---

[2] Our decision in this regard is supported by the opinion just issued in *People* v. *Smith*■ (Cal.App.). There, the Fifth District, applying the same reasoning to comparable facts, ruled that a detention could not be justified purely by a police officer's "ritualistic assumption" that anyone in the vicinity of an apartment designated in a search warrant might be connected to the criminal activity suspected in that apartment.

the remittitur. In that event, the court shall also reinstate the other count originally contained in the information. If defendant does not move to vacate his guilty plea, or if defendant otherwise waives his right to make such a motion, then the trial court shall reinstate the original judgment.

Dabney, J., and Timlin, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 21, 1991.