[No. A069644. First Dist., Div. Two. Aug. 21, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID A. SAMPLES, Defendant and Appellant.

COUNSEL

Susan K. Amato, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Joan Killeen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HAERLE, J.—

## I. INTRODUCTION

David A. Samples (Samples) was charged with transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)) (count 1), possession of methamphetamine for sale (Health & Saf. Code, § 11378) (count 2), and possession of narcotics paraphernalia, a misdemeanor (Health & Saf. Code, § 11364) (count 3.) Samples initially pleaded not guilty. After his suppression motion was denied, Samples withdrew his plea of not guilty and

entered a conditional plea of guilty to possession of methamphetamine, a lesser included offense under count 2 of the indictment. His sole contention on appeal is that his motion to suppress was improperly denied. (Pen. Code, § 1538.5.) We affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On June 14, 1994, a search warrant, attested to by Agent Marcus Young (Agent Young) of the Mendocino Countywide Narcotics Task Force, was issued. The warrant authorized the search of an apartment located at 4-B Louise Court, Ukiah, as well as the searches of two residents of that apartment, Dawn Carlesen (Carlesen) and Freddie Barnett (Barnett), for methamphetamines, drug paraphernalia, and other evidence which might establish possession of methamphetamine for sale.

About 9:10 p.m. on June 15, 1994, Agent Young and several other officers executed the warrant at the Louise Court apartment. Ronald Knight and Bonnie Barnett were in the apartment when Agent Young entered. They informed him that Barnett and Carlesen had gone to the store and would shortly return in a white Mustang.

At 9:40 p.m., Agent Young saw a white Mustang drive toward the apartment. Samples, the driver of the car, pulled up to the curb about 160 feet away from the apartment building, short of a red zone, and parked. Samples did not park in the driveway which led to a carport and a rear door for apartment 4-B. Officer Barry Inman (Inman), waiting in his patrol car, immediately pulled in behind Samples's vehicle, and Agent Young, along with two other officers, approached the car on foot from both sides. Inman recognized Barnett as a passenger in the backseat.

The events after this point are in dispute. Agent Young testified that he determined that Barnett and Carlesen were passengers in the backseat. He thereafter directed Samples and his wife, Karen Samples (Ms. Samples), to exit the two-door car so that Barnett and Carlesen, who were the focus of the search, could get out of the backseat. After Samples exited the car, Agent Young directed Officer McQueary (McQueary) to pat-search Samples "for officer safety." Agent Young was not aware of any suspicious activity on Samples's part before he exited the car. Rather, Agent Young explained, "the reason why I asked for a pat down search for officer safety, is basically my focus was on the two passengers in the rear of the vehicle. There's three additional people in the vehicle that were in our immediate area. And it was—there was basically a search due to officer safety just to make sure they didn't have any weapons on their person, if they were going to stay there."

McQueary testified that he began his search at Samples's waist area because that is the most likely place to find a weapon. He found a knife case, attached to a belt, on Samples's right hip. The knife case was four to five inches long, with a fold-over flap that snapped shut. McQueary did not find a knife inside but, rather, found a glass pipe that he suspected was used for smoking methamphetamine. He showed the pipe to Agent Young and then placed Samples under arrest and conducted a further search incident to arrest.

McQueary testified that he then found a plastic container containing approximately .4 grams of suspected methamphetamine, a plastic "ziplock" bag containing approximately .1 grams of suspected methamphetamine, approximately 10 "ziplock" bags of assorted sizes, a large baby bottle liner and a short straw in Samples's right shirt pocket. In Samples's left shirt pocket, McQueary found $553 in cash.

Inman testified that he removed a brown paper bag from behind the driver's seat on the floorboard near Charles Renfro (Renfro), the third backseat passenger. Inside was a small amount of suspected methamphetamine in a "ziplock" bag, a grinding device, a set of scales, packaging material in three sizes, coin bags, metal instruments, and another methamphetamine pipe.

Ms. Samples, testifying on Samples's behalf, gave a different version of events. Ms. Samples testified that they were returning from dinner the evening of June 15 when the police approached the car. In the car with her were Samples, and her son, Renfro, her nephew, Barnett, and his girlfriend, Carlesen. Ms. Samples testified that she started to get out of the car when Agent Young approached her with his gun drawn. He told her to put her hands on her head and sit down. When Agent Young asked Ms. Samples if she was Dawn Carlesen, Carlesen identified herself from the backseat. Ms. Samples complied with Agent Young's request that she exit the car and sit on the curb. She was never subjected to a search.

Ms. Samples further testified that Agent Young then asked Carlesen to get out of the car, and then pat-searched and handcuffed her. Another officer asked Samples if he was Barnett and if he was still on parole or probation. Samples responded "no" to both questions and Barnett identified himself from the backseat. After Samples got out of the car and stood by the front fender, an officer began emptying his shirt pockets. Ms. Samples did not see the officer pat-search Samples or reach towards his belt area beforehand. Samples was wearing a shirt that might have been covering his belt and knife case. Ms. Samples testified that she believed 15-20 minutes elapsed before

Samples's arrest and further testified that she believed that Barnett had not yet exited the car when Samples was searched.

For the most part, Samples's testimony was consistent with that of Ms. Samples. He testified that as he exited the car, McQueary "ushered" him around to the front of the car, and began emptying his pockets, starting with his shirt pockets; he did not first pat-search Samples. Samples testified that McQueary did not find the knife case until he had gone through Samples's pockets again. McQueary did not find methamphetamine until the second search of his pockets. Samples was then handcuffed and placed under arrest. Unlike Ms. Samples, however, he did not see any officers with their weapons drawn.

By information filed on November 14, 1994, the Mendocino County District Attorney charged Samples with transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)) (count 1), possession of methamphetamine for sale (Health & Saf. Code, § 11378) (count 2), and possession of narcotics paraphernalia, a misdemeanor (Health & Saf. Code, § 11364) (count 3.) The information alleged that Samples had served a prior prison term for his conviction of assault with a deadly weapon (Pen. Code § 667.5, subd. (b).) On November 15, 1994, Samples pleaded not guilty and denied the allegation.

On January 10, 1995, Samples filed a Penal Code section 1538.5 motion to suppress evidence which the prosecution opposed. Following a hearing held on January 27 and February 3, 1995, the trial court denied the motion. On February 7, 1995, Samples withdrew his plea of not guilty and entered a conditional plea of guilty to possession of methamphetamine, a lesser included offense under count 2 of the indictment. The court dismissed the remaining counts with a *Harvey*[1] waiver.

On April 14, 1995, the trial court sentenced Samples to the upper term of three years, stayed execution of sentence, and placed appellant on probation for five years, with the condition that he complete a thirty-day drug treatment program. On the same date, Samples filed a notice of appeal.

### III.  DISCUSSION

#### A.  *Standard of Review*

Appellant correctly notes that there are two issues involved in this appeal, namely, the legality of (1) the detention of appellant and (2) the pat-search

---

[1]*People* v. *Harvey* (1979) 25 Cal.3d 754, 758 [159 Cal.Rptr. 696, 602 P.2d 396].

of him by Officer McQueary. We shall deal with these issues in that order. However, before doing so, it is relevant to note both what the trial court concluded regarding witness credibility and what that means regarding our standard of review.

At the conclusion of the hearing before the trial court, which as noted included the testimony of appellant, his wife, and the three officers mentioned above, the trial court noted the following in denying the suppression motion: "The evidence at this hearing established that the officers were present near the premises of 4B Louis [sic] Court for the purposes of serving a warrant. The search warrant they had with them armed them with authority, and, in fact, commanded them to make a search of not only the premises, but also the persons of Freddie Barnett and Dawn Carlson [sic] for controlled substances and related items. [¶] The officers present—Well, before they arrived at the scene, they had information that Barnett and Carlson [sic] would be returning to that location on Louis [sic] Court in a white Mustang. And as predicted, they did arrive on Louis [sic] Court. They didn't pull into the premises, they parked down the street. And based on the testimony, including Mr. Gray's testimony, it looks like they parked about 150 feet from the front door of the residence at 4B Louis [sic] Court. [¶] . . . [¶] The driver of the car was Mr. Samples. And with respect to the authority of the officers to pat down people who were in the car, other than Mr. Barnett and Mrs. Carlson [sic], the same officer safety considerations that permit such a pat down search for weapons of people who are physically on the premises to be searched, applies in this situation where they're in the car with the two people to be searched. [¶] There was necessarily a brief detention, anyway, for the purpose of getting Barnett and Carlson [sic] out of the car to perform the duty of searching them, as commanded by the warrant. And the further brief detention of the others, including Samples, for the purpose of patting them down was not overly intrusive. In addition, the purpose of that search was an important purpose for the officer to neutralize and defuse the area within which they are focusing their attention on, in the performance of the duties they have under the warrant. [¶] I believe Officer McQueary's testimony, that he always starts at the waist, and he started at the waist in this case. If Officer McQuery [sic] had gone into the shirt the first time he would have found the drugs, he wouldn't have had to go in a second time."

█ It is thus clear that the trial court, which saw and heard the pertinent witnesses, credited Officer McQueary's version of the events. That being the case, we necessarily defer to those factual findings where "supported by substantial evidence." (*People* v. *Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729] (*Glaser*).) Those findings are indeed so supported here. However, in "determining whether, on the facts so found, the

search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*Glaser, supra,* 11 Cal.4th at p. 362.)

## B. *Legality of the Detention*

■ Appellant argues that the initial detention of appellant was unlawful under Fourth Amendment standards because the police did not and could not "point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity," quoting from our Supreme Court's definition of the applicable rule in *People* v. *Souza* (1994) 9 Cal.4th 224, 231 [36 Cal.Rptr.2d 569, 885 P.2d 982]. We disagree.

The leading United States Supreme Court case on the validity of a detention in a case such as this is *Michigan* v. *Summers* ( 1981) 452 U.S. 692 [69 L.Ed.2d 340, 101 S.Ct. 2587] (*Summers*). In that case, police officers were about to execute a warrant to search a house for narcotics when they encountered the defendant descending the front steps of the house. They detained him and other occupants of the house while they searched it. After they found narcotics in the building's basement and ascertained that the defendant was the owner of the building, they arrested him, searched him, and thereupon found heroin in a pocket. The issue for the Supreme Court was the legality of the initial detention while the search of the building was in progress.

The Supreme Court upheld the detention, noting that it was substantially less intrusive than an arrest. The Supreme Court stated: "Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers . . . ." (*Summers, supra,* 452 U.S. at pp. 702-703 [69 L.Ed.2d at p. 349].) The court also noted the fact that a warrant had been issued to search the house and that, therefore, "a neutral magistrate rather than officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home." (*Id.* at p. 703 [69 L.Ed.2d at p. 350].)

Our own Supreme Court relied heavily on *Summers* in its recent decision in *Glaser.* The issue before the court in that case was the legality of an initial detention of the appellant who was found trying to enter premises the police had a warrant to search on the proverbial "dark and stormy night" in Glenn County. Relying strongly on the analysis in *Summers,* a unanimous Supreme Court concluded that the "brief detention of defendant was justified by the

need to determine what connection defendant, who appeared to be more than a stranger or casual visitor, had to the premises, and by the related need to insure officer safety and security at the site of a search for narcotics." (*Glaser*, *supra*, 11 Cal.4th at p. 365.)

The United States Court of Appeals for the Ninth Circuit has extended the rationale of *Summers* to the type of automobile stop involved here. In *United States* v. *Vaughan* (9th Cir. 1983) 718 F.2d 332 (*Vaughan*), the defendant was a passenger in a car driven by one Otero and in which one Lahodny was another passenger. The car was stopped by agents of the San Diego narcotics task force about two blocks from Lahodny's house; a warrant was out for Otero's arrest and the agents also had a probation violation warrant for Lahodny. The defendant was unknown to the agents.

After the car was stopped, all three people exited. One of the agents drew his gun and ordered all three to "freeze." Vaughan, carrying a briefcase under his arm, started to walk away, but the agent brought him back to the car. After this episode repeated itself, Vaughan was handcuffed and the briefcase taken from him. The issue before the Ninth Circuit was the legality of the agents' subsequent search of the briefcase; the court ultimately ruled that search to have been improper. However, in the course of so ruling, the court held that the agents did have a right "to detain Vaughan briefly while they searched his companions," citing *Summers*. (*Vaughan*, *supra*, 718 F.2d at p. 334.) In support of this proposition, the court discussed *Summers* and the factors identified there as justifying such a detention. It held: "The same factors justify Vaughan's detention. This was not a routine traffic arrest of a driver of a vehicle. Rather, warrants had been issued to arrest Otero and Lahodny and, pursuant to the arrests, the officers had the authority to search the passenger compartment of the car. If the search had turned up any evidence to incriminate Vaughan, he could have been arrested also. The officers were fully justified in preventing Vaughan from walking away . . . ." (*Id.* at p. 335.)

The *Vaughan* court distinguished the factual circumstances present there with those present in an earlier United States Supreme Court opinion, *Ybarra* v. *Illinois* (1979) 444 U.S. 85 [62 L.Ed.2d 238, 100 S.Ct. 338] (*Ybarra*), a case relied upon by appellant here. In *Ybarra* the court held that officers could not detain (and, importantly, conduct a patdown search of) a patron in a commercial tavern being searched pursuant to a warrant. However, and as our Supreme Court noted in *Glaser*, "*Ybarra* is distinguishable . . . as involving the question of grounds for *searching*, rather than *detaining*, an individual during execution of a search warrant, and by the public and commercial nature of the premises being searched." (*Glaser*, *supra*, 11 Cal.4th at p. 368, fn. 3.)

Aside from *Ybarra*, appellant cites only one case, *People* v. *Gallant* (1990) 225 Cal.App.3d 200 [275 Cal.Rptr. 50] (*Gallant*), in support of his argument that his detention was improper. The remainder of the authority he discusses are cases where the courts held the detention justified, cases he then attempts to distinguish. And *Gallant* is not particularly helpful to him either, because the factual circumstances present there (defendant detained upon approaching a house where a search warrant for narcotics was being executed) are so similar to those in *Glaser* that the later and unanimous decision of our Supreme Court in that case seems to us to substantially eclipse the authority of *Gallant*.

In any event, the principle we deduce from *Summers*, *Glaser*, and *Vaughan*, as well as other pertinent cases,[2] is that a reviewing court should endeavor to balance the governmental interest which is sought to be protected against the degree of intrusion involved in the detention. This balancing must demonstrate that, to be sustainable, the detention meets "the ultimate standard of reasonableness embodied in the Fourth Amendment." (*Summers, supra*, 452 U.S. at pp. 699-700 [69 L.Ed.2d at p. 348], quoted in *Glaser, supra*, 11 Cal.4th at p. 364.)

Undertaking that balancing here, we have no hesitation in concluding that the detention of appellant was justified. The following factors lead us to this conclusion. First, the appellant was clearly in close association with several subjects of a search warrant which was then being executed. More specifically, he was not just a passenger in, but the driver of, a car containing two subjects of the warrant. Additionally, the car appellant was driving was predicted to be returning to, and did indeed return to, a house which was another subject of the warrant.

Second, the officer directing the detention, Agent Young, did so out of a concern for officer safety, a concern well recognized as of the highest order in a circumstance of this type. Our Supreme Court clearly recognized this in *Glaser*, stating: "The police interest in protecting against violence during the search of a home for narcotics has been widely recognized. 'In the narcotics business, "firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia." ' " (*Glaser, supra*, 11 Cal.4th at p. 367.)

Immediately after this, the Supreme Court quoted from our 1989 decision in *People* v. *Thurman* (1989) 209 Cal.App.3d 817, 824-825 [257 Cal.Rptr.

---

[2]Among the other leading authority we have considered on this issue are, of course, the seminal United States Supreme Court case on "stop and frisk" incidents, *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868] (as to which, see *post*) and *People* v. *Souza, supra*, 9 Cal.4th 224.

517] (*Thurman*) as follows: "[B]ecause of the private nature of the surroundings and the recognized propensity of persons 'engaged in selling narcotics [to] frequently carry firearms to protect themselves from would-be robbers,' [citation] the likelihood that the occupants [of a residence] are armed or have ready accessibility to hidden weapons is conspicuously greater than in cases where, as in *Ybarra*, the public freely enters premises where legal business is transacted."

The *Glaser* decision also quoted from the *Summers* opinion of the United States Supreme Court, a decision which stressed the public importance of officer safety in the specific context of the execution of narcotics search warrants in the following terms: " '[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.' " (*Glaser*, *supra*, 11 Cal.4th at p. 365, quoting *Summers*, *supra*, 452 U.S. at pp. 702-703 [69 L.Ed.2d at pp. 349-350].)

Third, the intrusiveness of the detention was minimal: it took place on a dark cul-de-sac, with a minimum of onlookers and, at least prior to the search next to be discussed, without handcuffs or drawn weapons. More importantly, the detention prior to the patdown search and the subsequent arrest was extremely short in duration. Under the principles derived from *Summers*, *Glaser* and *Vaughan*, these three factors combine to compel the conclusion that the initial detention of appellant was not improper under Fourth Amendment standards.

## C. *The Legality of the Patdown Search*

The legality of the pat-search conducted by Officer McQueary presents a slightly closer question. As noted earlier, Agent Young testified that he directed McQueary to conduct that search because "[t]here's three additional people in the vehicle that were in our immediate area. And it was— There was basically a search due to officer safety just to make sure they didn't have any weapons on their person, if they were going to stay there." A few minutes later he added what appears to be a supplemental explanation: "I believe I asked that there be a pat down search because they were at the scene." McQueary, for his part, testified consistently with Agent Young and the trial court explicitly credited that testimony, and implicitly did the same with respect to Agent Young's testimony.

Relying strongly on the United States Supreme Court's holding in *Ybarra*, where that court cautioned that ". . . mere propinquity to others independently suspected of criminal activity" does not, without more, permit a

detention and pat-search (see *Ybarra, supra,* 444 U.S. at p. 91 [62 L.Ed.2d at pp. 245-246]), appellant points out that, in this case, he was not a subject of any search warrant, was not at the time an occupant or even in the house that was such a subject, had "no apparent connection to [that] residence or the drug activities that allegedly occurred there, and did absolutely nothing to cause the police to suspect that he was involved in criminal activity or armed and dangerous." He further points out that the pat-search occurred on a public street and at a point in time after he had fully cooperated with the police by exiting the Mustang so that Barnett and Carlesen could get out of the backseat. These contentions are all essentially correct, but they overlook the two factors which the testimony and the trial court's findings identified as key, i.e, those of (a) officer safety and (b) the apparent relationship between the appellant and the subjects of the warrants. Some brief jurisprudential history concerning these factors is thus pertinent.

The seminal case regarding the legality of patdown searches is, of course, *Terry* v. *Ohio, supra,* 392 U.S. 1 *(Terry).* There, an officer observed two men "casing" a shop window by walking back and forth and conferring frequently with a third man. The officer approached the suspects and identified himself as an officer asked their names and grabbed one suspect, patting down the outside of his clothes. The officer discovered a gun in the suspect's pocket. The officer also found a gun in the other suspect's pocket. The officer then arrested them, and they were charged with carrying concealed weapons. One of the suspects (Terry) moved to suppress evidence of the gun, contending the "frisk" was an unreasonable search and seizure. The court found that the officer's conduct was lawful and affirmed the conviction. The court found that the "stop and frisk" was a search and seizure within the meaning of the Fourth Amendment. The court held, however, that there is a right to "stop and frisk" "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may be properly introduced in evidence against the person from whom they were taken." *(Id.* at pp. 30-31 [20 L.Ed.2d at p. 911].)

*Terry* has, of course, spawned a veritable host of cases, law review articles, and chapters of texts both with respect to that aspect of it dealing with detention alone but, and more importantly for present purposes, also with respect to the pat-search aspect of the decision. It would be both

presumptuous and impossible to try to discuss even the "California universe" of cases applying *Terry*. But we need not even consider any such venture, because our 1989 decision in *Thurman* makes clear the importance we assign to the officer safety issue so prominently highlighted in *Terry*. There, the police, executing yet another narcotics search warrant, entered a house and found appellant (along with two females) sitting "silently and passively on the sofa; he did not threaten the officer." (*Thurman, supra,* 209 Cal.App.3d at p. 821.) Nonetheless, the officer "ordered appellant to stand and 'immediately patted him down for weapons safety.' " (*Ibid.*) There as here, no weapon was revealed, but narcotics were. There as here, the appellant moved to suppress, with the issue inevitably becoming the legality of the "*Terry* patdown search." (*Ibid.*)

We commenced our analysis in *Thurman* by, of course, revisiting *Terry* and the policy principles there enunciated. We specifically quoted that part of *Terry* wherein Chief Justice Warren commented: " 'American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives. [¶] In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.' " (*Thurman, supra,* 209 Cal.App.3d at p. 822.)

We then endeavored to bring Chief Justice Warren's 1968 comment up to date: "The 'long tradition of armed violence' by the American criminal, to which the Chief Justice alluded, has not diminished since *Terry* v. *Ohio*. Indeed, illicit drug trafficking, now of epidemic proportion, has brought new dimension to this deplorable tradition. Rare is the day which passes without fresh reports of drug related homicides, open street warfare between armed gangs over disputed 'drug turf,' and police seizures of illicit drug and weapon caches in warranted searches of private residences and other locales. It is well recognized that '. . . the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence. . . .' [Citation.] Moreover, as Justice Rehnquist observed in his dissenting opinion in *Ybarra* v. *Illinois, supra,* 444 U.S. 85, 106 [62 L.Ed.2d 238, 255], citing *United States* v. *Oates* (2d Cir. 1977) 560 F.2d 45, 62: 'In

the narcotics business, "firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotic paraphernalia." ' " (*Thurman, supra,* 209 Cal.App.3d at p. 822.)

We then held: "We have no hesitation whatever in holding that [the officer] acted reasonably and prudently in conducting the pat search of appellant in the circumstances. Here, a neutral and detached magistrate had judicially approved a warranted search for evidence of drug trafficking at the private residence where appellant was found. The officers whose duty required them to execute the warranted search were thus well aware they were engaged in an undertaking fraught with the potential for sudden violence. . . . [¶] In this atmosphere [the officer], a 10-year veteran of police work, came upon appellant, at close range, quietly seated on a sofa. That appellant's posture, at that moment, was nonthreatening does not in any measure diminish the potential for sudden armed violence that his presence within the residence suggested. To require an officer to await an overt act of hostility, as appellant suggests, before attempting to neutralize the threat of physical harm which accompanies an occupant's presence in a probable drug trafficking residential locale, would be utter folly." (*Thurman, supra,* 209 Cal.App.3d at p. 823.)[3]

In our view, the philosophy we articulated in *Thurman* is equally applicable here. To be sure, in *Thurman* one officer was confronted with that appellant and two females in a room in a house in Vallejo. The present case involves an outdoor site, a cul-de-sac street in Ukiah, where four police officers had to deal, at 9:40 at night, with five occupants of a car, two of whom were the subject of warrants. But these are distinctions without a difference: just as in *Thurman,* the officers here were "engaged in an undertaking fraught with the potential for sudden violence" (*Thurman, supra,* 209 Cal.App.3d at p. 823) and it would be equally "utter folly" to require them to wait to search so as to protect themselves until there is "an overt act of hostility." (*Ibid.*)[4]

The fact that appellant was among five adults exiting from a car at police request underlines the reasonableness of the patdown search. The courts

[3]At oral argument, appellant's counsel suggested that *Thurman* was factually distinguishable because there the officers heard "footsteps running down the hallway" (*Thurman, supra,* 209 Cal.App.3d at p. 820) after they knocked and because it was peculiar that that defendant was simply sitting "passively on the sofa" (*id.* at p. 821) when the officer entered the front room. But nowhere in *Thurman* did we give any indication that these factors were in any way significant or justified, to any extent at all, the patdown search conducted in that case. To the contrary, we noted that there (as here) appellant argued that the "patdown . . . was prohibited because he was not . . . behaving in a threatening manner." (*Ibid.*) Our response to this argument was as quoted in the text above.

[4]We note again that our Supreme Court has recently cited (indeed quoted from) *Thurman* approvingly. (See *Glaser, supra,* 11 Cal.4th at p. 368.) Also supportive of our holding in *Thurman* are such other decisions as *People* v. *Limon* (1993) 17 Cal.App.4th 524, 534-535 [21

have long recognized that an automobile is an inherently dangerous place for the police to approach and at which to question individuals, containing as it does numerous possibilities for hidden weapons. That is why both the United States Supreme Court and the courts of this state have permitted the police to ask those they wish to question to exit automobiles. (See, e.g., *Pennsylvania v. Mimms* (1977) 434 U.S. 106, 110 [54 L.Ed.2d 331, 336-337, 98 S.Ct. 330]; *People v. Maxwell* (1988) 206 Cal.App.3d 1004 [254 Cal.Rptr. 124].) That being the case, it would make little sense, in the instant factual situation for example, to say that the police could, for officer safety purposes, ask the three companions of the two warrant subjects to exit the car into the dark night, but not permit them the right to promptly pat-search those companions for the same purposes.

The *Vaughan* case, discussed in the preceding part, provides a slightly different, albeit related, rationale for sustaining the trial court's ruling here. There, as previously noted, the defendant was given a patdown search after alighting from a car in which he was a passenger along with two others, both of whom were the subjects of narcotics-related search warrants. The federal Court of Appeals for the Ninth Circuit held that such a search was justified by the fact that the defendant there was the companion of subjects of warrants. Several other federal courts of appeals have similarly sustained searches of persons found on or near premises that were the subject of search warrants where "the person has a somewhat stronger link to the premises than Ybarra did to the bar where he was found." (See 2 LaFave, Search & Seizure (3d ed. 1996) § 4.9(d), pp. 635-642, fn. 76 and the cases cited therein.)

*Vaughan* effectively reiterated, albeit in the context of a search warrant, the Ninth Circuit's 12-year-earlier ruling in *United States v. Berryhill* (9th Cir. 1971) 445 F.2d 1189 (*Berryhill*). There, the same court affirmed the search of the purse of the wife of the defendant. They were stopped while he was driving a car in which she was a passenger by police who held a warrant for his arrest. After arresting the defendant and making an unfruitful search of his person, they then searched the handbag of his wife. The Ninth Circuit sustained that search, holding: "We think that *Terry* recognizes and common sense dictates that the legality of such a limited intrusion into a citizen's personal privacy extends to a criminal's companions at the time of arrest. It is inconceivable that a peace officer effecting a lawful arrest of an occupant

Cal.Rptr.2d 397] (police pat-search justified when police were outnumbered, area was known for weapons, and because "drug dealers often carry weapons") and *People v. Huerta* (1990) 218 Cal.App.3d 744, 750 [267 Cal.Rptr. 243] (person who entered residence during execution of a narcotics search warrant validly pat-searched for weapons; it was reasonable for officers to believe that "a person entering a residence of illicit drug activity might be armed.")

of a vehicle must expose himself to a shot in the back from defendant's associate because he cannot, on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance. All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed." (*Id.* at p. 1193.)

According to one law review comment, the Ninth Circuit's view on this issue was subsequently echoed by two other circuits, the Fourth and the Seventh.[5] All three have now adapted an "automatic companion" rule in such cases, i.e., a rule that a companion of an arrestee may be automatically "frisked" for weapons. The Eighth and Sixth Circuits, the comment notes, have held that *Terry* does not permit of any such "bright line rule," and that any such search should be evaluated under the "totality of the circumstances."[6] (See Comment, *The Automatic Companion Rule: A Bright Line Standard for the Terry Frisk of an Arrestee's Companion* (1987) 62 Notre Dame L.Rev. 751.)

We need not decide whether such an "automatic companion" rule is appropriate under *Terry*, nor whether, if so, it may be extended to cover companions of the subjects of search warrants, as distinguished from arrest warrants. Again, and as noted in our previous discussion of the detention issue, this appellant was more than just a casual, sidewalk companion of a person who was the subject of a warrant or, as in *Ybarra*, a patron of a commercial establishment that was the subject of a search warrant. Rather, he was the driver of the car containing two people who were the subjects of search warrants and that car had been identified to the officers as likely to soon return to the house which was the other such subject. There was, thus, an apparent close physical and functional association between appellant and persons who were the subjects of search warrants. Put another way, and in Professor LaFave's words, there was clearly a "stronger link" here than in *Ybarra* between appellant and the subjects of the search warrant.[7]

In summary, the record here establishes that (1) there was apparently a close physical and functional association between appellant and the subjects

---

[5]The decisions in question are *United States* v. *Poms* (4th Cir. 1973) 484 F.2d 919 and *United States* v. *Simmons* (7th Cir. 1977) 567 F.2d 314. The Fifth Circuit also appears to be of this view. (See *United States* v. *Tharpe* (5th Cir. 1976) 536 F.2d 1098, 1100-1101 and *United States* v. *Sink* (5th Cir. 1978) 586 F.2d 1041, 1047-1048). Also instructive in this area is the Second Circuit's decision in *United States* v. *Barlin* (2d Cir. 1982) 686 F.2d 81, a case which our Supreme Court cited approvingly in *Glaser, supra,* 11 Cal.4th at page 371, footnote 4.

[6]These decisions are *United States* v. *Flett* (8th Cir. 1986) 806 F.2d 823 and *United States* v. *Bell* (6th Cir. 1985) 762 F.2d 495; in both, the patdown searches were found to have been reasonable under the circumstances.

[7]2 LaFave, Search & Seizure, *supra,* § 4.9(d), p. 641.

of a search warrant, (2) the incident took place at night, and (3) involved two persons who were subjects of that warrant plus three other adults. We must and do consider these factors in light of the vital officer safety consideration most prominently identified in *Terry* and recently stressed by us (and in a drug search warrant context) in *Thurman.* That consideration leads us to conclude that the patdown search undertaken of appellant here was, in the "totality of the circumstances," eminently reasonable for Fourth Amendment purposes.

## IV. CONCLUSION

The judgment of conviction is affirmed.

Kline, P. J., and Lambden, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 18, 1996.